No. 91,470

STATE OF KANSAS, *Appellee,* v. ROBERT BUEHLER-MAY, *Appellant.*

110 P.3d 425

Opinion filed April 22, 2005.

*Sarah Ellen Johnson,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Michael A. Russell,* chief deputy district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Robert Buehler-May of premeditated first-degree murder, conspiracy to commit first-degree murder, and aggravated kidnapping. The trial court imposed a hard 50 life sentence for the murder conviction, 155 months' imprisonment for the aggravated kidnapping conviction, and 117 months' imprisonment for the conspiracy conviction, all sentences to run concurrently.

Buehler-May timely appeals his convictions and sentence, arguing the trial court erred in: (1) denying a motion filed on the first day of trial in which Buehler-May sought to endorse a psychiatrist as an expert witness; (2) admitting photographs of the murder victim which Buehler-May argues are gruesome and cumulative; (3) failing to instruct the jury that it should consider with caution the testimony of an accomplice; (4) applying the Kansas hard 50 sentencing provisions, which Buehler-May argues are unconstitutional; and (5) imposing a hard 50 sentence based in part upon a factor which the same judge had determined insufficient when sentencing a codefendant, Kyle Cavaness, whose conviction and sentence we upheld in *State v. Cavaness*, 278 Kan. 469, 101 P.3d 717 (2004).

We affirm.

*Facts*

Alisha Gray testified that in October 2002 she was living with her brother, Kyle Cavaness, and her boyfriend, Ryan Goldenburg, at a home in Wyandotte County. The victim, Deangelo Wheeler, was also staying at the home. Wheeler sold crack cocaine to Gray, Cavaness, and Goldenburg.

The defendant, Robert Buehler-May, was close friends with Gray and Cavaness but had never met the victim until the night of the murder. On October 9, 2002, Buehler-May came over to Gray's house. He stayed at the house while Gray went with Wheeler to purchase crack cocaine. Gray, Goldenburg, and Cavaness smoked the crack cocaine. Buehler-May was not smoking crack that night. In the early morning hours, Goldenburg and Wheeler left to purchase more crack cocaine while Gray, Cavaness, and Buehler-May waited at the house. When they returned, Wheeler accused the others of having stolen his marijuana joint while he was gone. Wheeler mainly accused Buehler-May, calling him a thief. Wheeler and Buehler-May got into a verbal argument. Eventually, after Buehler-May called Wheeler a "pussy," Wheeler stood up. Gray did not see Wheeler with a weapon.

Gray believed the men were about to fight and went into her bedroom. The men went outside and Gray heard someone other than Wheeler say, "Hit him." When the men carried Wheeler back into the house, he was badly hurt, not moving or saying anything, and he had a bleeding gash on his head. Whenever Wheeler woke up, the men, primarily Buehler-May, would continue to beat him. This happened about three times. Gray heard the men saying they could not let Wheeler go in that condition for fear of retaliation.

Gray's next-door neighbor, Michael Dressler, testified that either Cavaness or Goldenburg called him and asked him to bring over something with which to tie up Wheeler. When Dressler brought over some telephone wire, he saw Wheeler lying on the floor with his legs moving. When Dressler came back to the house about a half hour later, he saw that Wheeler's legs were bound. He

also heard Wheeler calling out, and Buehler-May "went in and quieted him down."

Gray testified that about a half hour after the men brought Wheeler into the house, Buehler-May came into Gray's bedroom and said he had broken Wheeler's neck, killing him. Buehler-May and Goldenburg then wrapped Wheeler's body in a tarp and put him on the back porch.

On October 10, 2002, Buehler-May told his close friend Ashley McCann that he had murdered someone. McCann noticed a pile of bloody clothes and bloody shoes in Buehler-May's bedroom. Later the same day, McCann and Buehler-May drove to Cavaness' house to buy some marijuana. Gray, Goldenburg, and Cavaness were at the home. Buehler-May, Goldenburg, and Cavaness began bragging and laughing about how they had beaten and eventually killed the victim the night before. Buehler-May said he had snapped the victim's neck. He also pointed out to McCann where the victim's body was outside. McCann heard the men discussing whether to burn the body or dump it in the river. The next day, McCann contacted police.

After Buehler-May was arrested, he was interviewed by Detective Lawson. Buehler-May waived his *Miranda* rights and made a videotaped statement which was played for the jury and is included in the record on appeal. In that statement, Buehler-May admitted his involvement in the murder. Buehler-May stated that when the argument escalated and the men went outside, Buehler-May hit the victim with a wooden dowel, Cavaness hit him with a baseball bat, and Goldenburg hit him with bolt cutters. They then dragged the victim back inside the house to keep him out of sight. Inside the house, all three men continued to beat the victim whenever he regained consciousness. The men then placed bags over the victim's head in an attempt to hasten his death. Buehler-May estimated that at least 2 and ½ hours elapsed from the time the beating began until the victim died.

Cavaness showed police where the men had thrown Wheeler's body into the river and where they had burned the clothes they had been wearing on the night of the murder. An underwater search and rescue team located Wheeler's body a few days after

the murder. The body was wrapped in a blue tarp with two large bricks attached. The victim's head was covered by a white plastic bag; his arms were tied behind his back and his ankles were tied together.

Forensic pathologist Dr. Erik Mitchell performed the autopsy. He testified that Wheeler had multiple injuries to his head consistent with being struck by a hard object like a baseball bat or bolt cutters. Wheeler's brain was bruised and swollen as a result of his injuries. His neck was also bruised but not broken. Dr. Mitchell testified that Wheeler died as a result of all of the blows to his head. He stated, "I cannot isolate one injury and say this is the one that did it, the others are not important." Dr. Mitchell stated that asphyxia due to the plastic bags placed over Wheeler's head might also have contributed to his death.

Buehler-May's defense was a combination of self-defense and compulsion. He testified that when the fight escalated and moved outside, he armed himself with a wooden pole because he thought Wheeler had a knife. According to Buehler-May, Cavaness and Goldenburg struck Wheeler first. Buehler-May also struck Wheeler, but then tried to stop Cavaness and Goldenburg from further attacking him. When Buehler-May struck Wheeler, he thought Wheeler was coming at him.

Buehler-May also testified that after the men brought Wheeler in the house, Cavaness and Goldenburg continued beating him. Buehler-May suggested taking Wheeler somewhere and dropping him off, or calling the police and telling them Wheeler had broken into the house so that he could get medical attention. At that point, Goldenburg and Cavaness began threatening Buehler-May, telling him it did not matter if there was one body or two and threatening to go after Buehler-May's brother. Goldenburg and Cavaness were adamant that Wheeler could not be allowed to survive because of the repercussions from Wheeler's friends. They told Buehler-May to place a bag over Wheeler's head and tie it, which he did. When Wheeler still did not die, they told Buehler-May to choke him.

Buehler-May's trial testimony differed from his interview with police in that he never told the police that he had seen Wheeler

with a knife or that he had been threatened by Cavaness or Goldenburg.

*Did the Trial Court Abuse its Discretion by Refusing to*
*Endorse Defense Witness Dr. Montolio on the Morning of Trial?*

On the morning of trial, defense counsel filed a motion to endorse Dr. Montolio, Buehler-May's childhood psychologist, as a witness. The motion stated that Dr. Montolio had recently performed a clinical examination of Buehler-May and provided defense counsel with a copy of his report the day before trial. According to Dr. Montolio's report, he had treated Buehler-May for approximately 10 years while Buehler-May was between the ages of 6 and 16. Buehler-May had been diagnosed with a variety of mental disorders and was prescribed several medications but often failed to take them. Dr. Montolio concluded that although Buehler-May remembered the events on the night of the murder, because Buehler-May was "without sleep and at the time not being medicated, this examiner can state with a relative degree of medical certainty that his judgment was impaired on the night in question due to cognitive impairment and possible transient psychotic thoughts brought on by his Bi-Polar disorder." Dr. Montolio was out of town until the fourth day of trial and could be reached only by telephone.

In arguing the motion, defense counsel mentioned that he had informed the trial court a week earlier that he was awaiting the results of the evaluation and that Dr. Montolio had seen Buehler-May as an adolescent. In support of the motion to endorse, defense counsel argued that Dr. Montolio's report showed that Buehler-May's cognitive problems and mental disorders impaired his judgment and asked that Dr. Montolio be allowed to testify "about whether or not that rose to the level of a defense in this case."

The prosecutor objected to the late endorsement of Dr. Montolio, arguing that if Dr. Montolio's report and testimony were being offered as evidence of a mental disease or defect which prevented Buehler-May from forming the requisite intent, then Buehler-May had failed to give the notice required by K.S.A. 22-3219.

If the evidence was not being offered to show lack of mental state, then it was irrelevant and inadmissible.

The trial court ruled that, assuming Buehler-May's motion was intended to constitute notice of his intention to assert lack of mental state as a defense pursuant to K.S.A. 22-3219, his motion was untimely and he had failed to establish good cause for filing it out of time. Thus, the trial court denied Buehler-May's motion to endorse Dr. Montolio as a witness.

K.S.A. 22-3219(1) requires a defendant to file a written notice of the intent to assert a defense that the defendant, because of mental disease or defect, lacked the mental state required as an element of the offense charged. "Such notice must be served and filed before trial and not more than 30 days after entry of the plea of not guilty to the information or indictment." K.S.A. 22-3219(1).

The motion to endorse, if considered a notice of the defense, was not filed until July 21, 2003. Buehler-May was arraigned on November 26, 2002. Clearly, a motion filed on the trial date, almost 7 months after Buehler-May had entered a plea of not guilty, did not comply with the statute.

However, the statute allows the district court to permit notice at a later date for good cause shown. K.S.A. 22-3219(1).

In his motion to endorse Dr. Montolio, defense counsel explained he had not received the doctor's report until 4:15 p.m. on July 20. In arguing the motion, defense counsel stated that Buehler-May's family had been unable to retain Dr. Montolio to evaluate him until the end of June or beginning of July because of financial difficulties. Then, after Dr. Montolio met with Buehler-May around July 11, he had to wait for test results before preparing his report.

The trial court rejected these justifications for the late filing, concluding Buehler-May had not established good cause for the delayed notice. In order to succeed on appeal, Buehler-May must demonstrate that the trial court abused its discretion in so ruling. See *State v. Boyd*, 216 Kan. 373, 379, 532 P.2d 1064 (1975). In other words, he must show that the trial court's decision was "arbitrary, fanciful, or unreasonable. If reasonable persons could differ on the propriety of the action taken by the trial court, then it

cannot be said that the trial court abused its discretion." *State v. Martis*, 277 Kan. 267, 280, 83 P.3d 1216 (2004).

Buehler-May fails to meet this burden. Buehler-May's jury trial was originally set for February 2003, but was continued at his request so that he could obtain a competency determination. Buehler-May was found competent to stand trial, and his trial was rescheduled for July 21, 2003. The fact that Buehler-May requested a competency determination shows that there was some question as to his mental status well before his July 2003 trial setting and that there was more than sufficient time for any necessary mental examinations. Furthermore, if financial difficulties were the problem, Buehler-May could have filed a motion pursuant to K.S.A. 22-4508 (expert and other services in non-public defender cases) requesting the State to pay for a psychiatric examination.

Additionally, Buehler-May argues that *State v. Bright*, 229 Kan. 185, 623 P.2d 917 (1981), requires a trial court to consider seven factors in determining whether to exclude the testimony of a defense witness, and the trial court failed to consider those factors in this case. *Bright* requires the trial court to:

"(1) Inquire why the witness or witnesses were not disclosed;

"(2) determine when the witness first became known to defense counsel, and whether the nondisclosure was willful or inadvertent;

"(3) determine whether the proposed testimony is trivial or substantial, whether it goes to an important or minor issue;

"(4) determine the extent of prejudice to the State, and the importance of the witness to the defense;

"(5) determine any other relevant facts;

"(6) grant the State a recess if prejudice can be avoided or reduced by such action; and

"(7) avoid imposing the severe sanction of prohibiting the calling of the witness if at all possible. This should be viewed as a last resort." 229 Kan. at 194.

*Bright* offers "solid guidelines for the trial court in determining whether to allow a party in a criminal prosecution to call a witness or witnesses not disclosed but required to be disclosed prior to trial." *State v. Claiborne*, 262 Kan. 416, 423, 940 P.2d 27 (1997).

This court has not previously considered the effect of the *Bright* factors upon a motion to endorse a witness whose testimony would relate to a defense of lack of mental state. However, the applica-

bility of the *Bright* factors has been considered in the context of an alibi defense, another affirmative defense which has a statutorily imposed notice requirement. K.S.A. 22-3218. In the context of the alibi defense, we have held that the trial court must consider the *Bright* factors when a defendant has given notice of an alibi defense as required by K.S.A. 22-3218 and later seeks to endorse an additional alibi witness not originally disclosed to the State. *State v. Douglas*, 234 Kan. 605, 675 P.2d 358 (1984). However, in *Claiborne*, where notice of an alibi defense had not been given and the defendant knew or should have known about the proffered alibi witness long before trial, it was held that the trial court did not abuse its discretion in excluding the witness or in failing to consider the *Bright* factors. *Claiborne*, 262 Kan. at 424; see also *State v. Gibson*, 30 Kan. App. 2d 937, 952, 52 P.3d 339, *rev. denied* 274 Kan. 1115 (2002) (*Bright* factors do not apply where defendant failed to follow statutory notice requirements for alibi defense). There is no basis for a different rule when a defense under K.S.A. 22-3219 is asserted. We conclude that the trial court did not err in failing to consider the *Bright* factors where notice of a defense under K.S.A. 22-3219 had not been given and the only basis of relevance was to prove the defense allowed under that provision.

Furthermore, since Buehler-May failed to appropriately raise a defense of lack of mental state due to mental disease or defect, there is no other basis upon which to justify application of the *Bright* factors or to otherwise argue that the evidence should have been admitted. "Evidence of a defendant's mental capacity to commit a specific act is not admissible where a mental disease or defect defense under K.S.A. 22-3219 has not been raised." *State v. Papen*, 274 Kan. 149, Syl. ¶ 3, 50 P.3d 37 (2002).

Finally, Buehler-May argues that the trial court's decision infringed upon his constitutional right to present his theory of defense. He contends that, if the prosecution needed additional time to prepare, the court could have continued the trial. Buehler-May acknowledges he did not specifically request a continuance; however, in making its ruling, the trial court recognized that granting Buehler-May's motion would necessitate a continuance so that the

prosecution could talk to Dr. Montolio and it would be months before the trial could be rescheduled.

Although this court has not considered the issue with regard to a defense pursuant to K.S.A. 22-3219, we have determined that the notice required when a defendant relies upon an alibi defense does not deprive a defendant of the constitutional right to present a defense. *Claiborne*, 262 Kan. at 423. The United States Supreme Court reached the same conclusion in *Williams v. Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970), noting that the purpose of a notice provision is to "enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." 399 U.S. at 82. The Court also concluded that at most the notice requirement accelerates the time when the nature of the defense must be divulged. "Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense." 399 U.S. at 85.

The appellate courts of other states have applied the rationale of *Williams* in concluding it is not unconstitutional to require notice of an intent to plead insanity, to assert a lack of mental state defense, or to present evidence regarding mental condition as a mitigating factor at sentencing. See, *e.g.*, *Jackson v. State*, 267 Ga. 130, 475 S.E.2d 637 (1996); *Thomas v. State*, 420 N.E.2d 1216 (Ind. 1981); *State v. Bentley*, 155 Mont. 383, 472 P.2d 864 (1970); *State v. Reid*, 981 S.W.2d 166 (Tenn. 1998).

Similarly, the notice requirements of K.S.A. 22-3219 do not deprive a defendant of his or her constitutional due process right to defend against the State's case or the constitutional right to a fair trial.

Buehler-May has not established error in the trial court's decision to deny the motion to endorse the psychiatrist's testimony.

*Did the Trial Court Abuse its Discretion in Admitting into Evidence Photographs of the Murder Victim?*

Buehler-May's next argument is that the trial court abused its discretion in admitting numerous pictures of the victim's body. He

contends these pictures were gruesome, overly repetitious, and served only to inflame the jury. He also contends their probative value was limited because the cause of death was not disputed.

Buehler-May lodged a contemporaneous objection to the introduction of some of the photographs but not others. Where the defendant did not object to the admission of a photograph, he or she has failed to preserve the issue for appellate review. K.S.A. 60-404; *State v. Sims*, 262 Kan. 165, 169-70, 936 P.2d 779 (1997) (failure to object to admission of evidence at trial court level precludes review by appellate court).

Furthermore, there is no merit to his argument. In *Cavaness*, this court stated the rules applicable to appellate review of the admission of photographs into evidence:

"Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as 'evidence having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). As we recently stated:

'Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible.' [*State v. Parker*, 277 Kan. 838, Syl. ¶ 5, 89 P.3d 622 (2004)]." *Cavaness*, 278 Kan. at 477.

Exhibit 5 is a photograph of the victim's face; Alisha Gray identified the victim from this picture. Crime scene investigator Kim Crockett testified about exhibits 60 through 75. Exhibits 60 through 62, which are photographs not at issue in *Cavaness*, are aerial photographs of the underwater rescue team as it recovered the victim's tarp-wrapped body from the river. Exhibits 63 through 67 showed the way the body was wrapped in a tarp with bricks attached, and exhibits 68 through 75 showed how the body was bound and a plastic bag placed over his head. The remaining exhibits were autopsy photographs which showed the different injuries to the victim's head.

In *Cavaness*, Buehler-May's codefendant's appeal, this court considered the same arguments with regard to the same photographs (except exhibits 60 through 62 which were not at issue in

*Cavaness*) and determined that all of the photographs were relevant because they showed the violent nature of the victim's death, aided the medical examiner in explaining the cause of death, and provided evidence of premeditation, a contested element of the crime. *Cavaness*, 278 Kan. at 477-78. Furthermore, we note that all of the pictures were relevant to corroborate the testimony of witnesses.

In his brief, Buehler-May contends that the cause of death was not disputed. However, even where a defendant concedes the cause of death, the prosecution still bears the burden of proving all of the elements of the crime charged. *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 (2001). Furthermore, the cause of death was at issue in this case where there was testimony that Buehler-May snapped the victim's neck and conflicting evidence that the victim's neck was not broken and that he had died of multiple head injuries instead. The cause of death was also important because the defense contested the element of premeditation.

All of the complained-of photographs were relevant. However, as discussed in *Cavaness*, there is an additional consideration because, even though the photographs are relevant, we have recognized that the trial court has discretion to exclude relevant evidence.

"While the admission of gruesome photographs is rarely held to be an abuse of discretion, this court has done so in cases where the probative value was slight and the prejudicial effect great (other grounds for a mistrial were present). *State v. Harris*, 259 Kan. 689, 710, 915 P.2d 758 (1996). An abuse of discretion may be reached if the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990)." *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001).

In *Cavaness*, we determined that the trial court had not abused its discretion in admitting the same photographs which were admitted in this case. *Cavaness*, 278 Kan. at 478. Buehler-May, who has the burden to establish the abuse of discretion (see *State v. Bey*, 270 Kan. 544, 546, 17 P.3d 322 [2001]), presents no argument which would lead to a different result in this case. Furthermore, the photographs which were admitted in this case but not disputed

as part of Cavaness' appeal, exhibits 60 through 62, are aerial photographs which are not gruesome or unduly cumulative.

Buehler-May has failed to establish error in the rulings to introduce the photographs into evidence.

### *Did the Trial Court Err by Failing to Instruct the Jury to ConsiderWith Caution the Testimony of an Accomplice?*

Next, Buehler-May argues the trial court erred in failing to instruct the jury to consider with caution the testimony of accomplices Alisha Gray and Michael Dressler. Buehler-May acknowledges he did not request such an instruction and that this court should reverse only if it finds the failure to give the instruction was clearly erroneous. See *State v. Crume*, 271 Kan. 87, 93, 22 P.3d 1057 (2001). The failure to give an instruction is clearly erroneous only if the appellate court reaches a firm conviction that, had the instruction been given, there was a real possibility the jury would have returned a different verdict. *State v. Boone*, 277 Kan. 208, 220, 83 P.3d 195 (2004).

According to Buehler-May, both Gray and Dressler had incentives to downplay their own involvement in the crime and overstate Buehler-May's involvement. He argues the jury should have been instructed consistent with PIK Crim. 3d 52.18, which provides:

"An accomplice witness is one who testifies that (he)(she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

In determining whether prejudicial error has occurred in the failure to give an accomplice instruction, courts generally look to the extent and importance of the accomplice testimony, as well as any corroborating testimony. *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995).

Other than Buehler-May, Gray was the only person to testify who was present during the entire incident. She described the events leading up to the murder, the relationships of the parties, and the participation of Buehler-May, Cavaness, and Goldenburg in the murder. Although she did not actually see any of the men hit Wheeler, Gray's testimony was an important part of the State's case.

Dressler, the next-door neighbor who brought wire over to the house to bind the victim, saw the injured Wheeler lying on the floor. While Dressler was in the bedroom with Gray, he heard Buehler-May go into the living room to "quiet up" Wheeler. Dressler's testimony was also important, though less so than Gray's.

Although both Gray and Dressler were important witnesses, the most damning evidence came from Buehler-May himself in the form of his videotaped statement to police. In that statement, Buehler-May corroborated the testimony of both Gray and Dressler. Buehler-May admitted that he had participated along with Cavaness and Goldenburg in beating the victim both outside and inside the house. He also admitted helping to tie up the victim and placing plastic bags over the victim's head to hasten his death.

In addition, both Gray and Dressler were questioned about their plea bargain arrangements in front of the jury. Gray testified that she was charged with aiding a felon and pleaded guilty to a reduced charge of attempting to aid a felon in exchange for her testimony against Cavaness and Buehler-May. Dressler testified that he was charged with and pleaded guilty to aiding a felon for his participation in the murder. His parole was also revoked and he was in custody at the time he testified. Defense counsel had the opportunity to cross-examine both Gray and Dressler about their motives for testifying.

Furthermore, "[t]he failure to give an accomplice instruction is not reversible error if the defendant's guilt is plain, [citation omitted], or if the judge provided another instruction which cautioned the jury about the weight to be accorded testimonial evidence." *Crume,* 271 Kan. at 94-95. Here, as in *Crume,* the jury was instructed consistent with PIK Crim. 3d 52.09: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

Given Buehler-May's corroborating statement, defense counsel's cross-examination of Gray and Dressler about their plea bargain arrangements and motivation for testifying, and the trial court's instruction on witness credibility, the trial court's failure to give an accomplice instruction was not clearly erroneous.

*Is Kansas' Hard 50 Sentencing Scheme Unconstitutional?*

Buehler-May's next argument on appeal is that the Kansas hard 50 sentencing scheme is unconstitutional because it does not afford criminal defendants their right to have a jury determine beyond a reasonable doubt all facts which might increase the maximum penalty for first-degree murder. Buehler-May recognizes that this court has already rejected this argument but raises the issue to preserve it for federal review.

Buehler-May's challenge to the hard 50 sentencing scheme is based on the holding of *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). This court addressed a similar challenge to the hard 40 sentencing scheme in *State v. Conley,* 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), concluding that the sentencing statutes were not unconstitutional because the hard 40 sentence did not increase the maximum length of Conley's life sentence but limited the lower end of the sentence in a manner consistent with *McMillan v. Pennsylvania,* 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986) (facts that do not increase defendant's punishment beyond that authorized by the underlying statute need not be proven to a jury beyond a reasonable doubt).

In *State v. Douglas,* 274 Kan. 96, 111, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003), this court relied on *Conley* in holding that the hard 50 sentencing scheme is constitutional. The court reaffirmed that ruling in *State v. Boldridge,* 274 Kan. 795, 812, 57 P.3d 8, *cert. denied* 538 U.S. 950 (2003); *State v. Hebert,* 277 Kan. 61, 107-08, 82 P.3d 470 (2004); and subsequent cases. Buehler-May has cited no new authority post-dating those cases which might convince this court to alter its position.

Buehler-May contends that the *Apprendi* majority is likely to revisit the *McMillan* decision in the future. However, the State points out that the United States Supreme Court recently did so in *Blakely v. Washington,* 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), and distinguished *McMillan* rather than overruling it. We recently determined in *State v. Hurt,* 278 Kan. 676, 101 P.3d 1249 (2004), that *Blakely* does not affect this court's analysis in *Conley* and, once again, we reaffirm that conclusion.

*Did the Trial Court Err By Imposing a Hard 50 Sentence Based Upon the Aggravating Factor That the Murder was Committed in an Especially Heinous, Atrocious, or Cruel Manner?*

Finally, Buehler-May challenges the trial court's imposition of the hard 50 sentence based upon the finding that the killing was committed in an especially heinous, atrocious, or cruel manner. When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is " 'whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstances by a preponderance of the evidence.' [Citations omitted.]" *State v. Boldridge*, 274 Kan. 795, 808, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003).

K.S.A. 2004 Supp. 21-4636(f) provides that, for purposes of the hard 50 sentencing scheme, one aggravating circumstance is that the defendant committed the crime in an especially heinous, atrocious, or cruel manner. The following conduct by a defendant is deemed sufficient to establish this aggravating circumstance:

"(1) Prior stalking of or criminal threats to the victim;

"(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

"(3) infliction of mental anguish or physical abuse before the victim's death;

"(4) torture of the victim;

"(5) continuous acts of violence begun before or continuing after the killing;

"(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

"(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel." K.S.A. 2004 Supp. 21-4636(f).

In this case, the trial court found that the defendant committed the crime in an especially heinous, atrocious, or cruel manner based upon several different factors. First, the court found that Buehler-May had inflicted mental anguish and physical abuse before the victim's death, conduct specified as sufficient to be considered heinous, atrocious, or cruel under K.S.A. 2004 Supp. 21-4636(f)(3). A rational factfinder could have found these facts by a preponderance of the evidence.

Although the court mentioned torture, another factor specified at K.S.A. 2004 Supp. 21-4636(f)(4), it did not make a clear finding that the victim was tortured. The court stated, "I suppose that that would constitute torture, that torture is not necessarily something additional to that, but that's certainly within the realm of what we're talking about here."

As a third factor weighing toward the conclusion that the murder was committed in an especially heinous, atrocious, cruel manner, the trial court concluded that there were continuous acts of violence as specified in K.S.A. 2004 Supp. 21-4636(f)(5). Buehler-May contends the trial court found the same evidence to be insufficient to show continuous acts of violence as an aggravating factor in Cavaness' case. However, this contention cannot be verified in the record on appeal because it does not contain a transcript of Cavaness' sentencing proceeding. There is no indication in the record whether the trial court considered and rejected continuous acts of violence as an aggravating factor in Cavaness' case. Further, there is sufficient evidence of continuous acts of violence begun before the death to satisfy the standard of review.

Finally, the court found that the victim's body was desecrated. The court stated:

"As to Mr. Cavaness, when I ruled upon this, I ruled that the [victim's] body was not desecrated. I think had I given — having thought this matter over, I would probably have ruled differently as to that. The fact that the body was wrapped in a tarp, was left in a house for a day or so and then thrown in the river, upon reflection, I think that does indicate a desecration to some extent."

Buehler-May argues that the trial court's finding of desecration is unsupported by the evidence. He contends that bodies naturally decompose after death and his actions merely speeded up that process. He also argues there is nothing unique about attempting to conceal a body by wrapping it in a tarp and throwing it in a river which sets this case apart from the typical murder case.

K.S.A. 2004 Supp. 21-4636(f)(6) requires a "desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing." We need not determine whether there is evidence to support the requirement of desecration because the trial court did not make the required finding that

there was an indication of a particular depravity of mind and there is not sufficient evidence to support such a conclusion. "Particularly" means "to a great degree." Webster's II New College Dictionary 801 (1999). Depraved means "heinous; morally horrendous." Black's Law Dictionary 473 (8th ed. 2004). Thus, a defendant's actions must be heinous to a great degree to meet the threshold for this factor to apply. The secreting of a body is commonly part of the criminal scheme. While such conduct offends the communities' moral sensibilities and is reprehensible, it is not an action which we would find to be per se heinous to a great degree. Certainly, under some facts the manner of hiding or disposing of a body may be particularly depraved. In this case, however, the evidence that the body was wrapped in a tarp and placed in a river does not support a conclusion that Buehler-May's actions were particularly depraved.

Even though we conclude that the evidence does not support this one factor, there are other factors which support the conclusion that Buehler-May's actions were particularly heinous, atrocious, and cruel. K.S.A. 2004 Supp. 21-4636(f) does not require that all of the listed factors apply, stating that "any of the following conduct by the defendant may be considered sufficient" to conclude that the murder was committed in an especially heinous, atrocious, or cruel manner. Thus, a finding that a crime was committed in an especially heinous, atrocious, or cruel manner will not be overturned on appeal if there is sufficient evidence, when reviewed in the light most favorable to the prosecution, for a rational factfinder to find the existence of any one of the types of conduct specified by K.S.A. 2004 Supp. 21-4636(f).

In this case, because there is sufficient evidence to support such a conclusion as to the existence of several factors, including those under K.S.A. 2004 Supp. 21-4636(f)(3) and (5), there is sufficient evidence to support the conclusion that Buehler-May committed the murder in an especially heinous, atrocious, or cruel manner. The trial court's use of the aggravating factor in determining Buehler-May's sentence was not erroneous.

Affirmed.

GERNON, J., not participating.

LARSON, S.J., assigned.