No. 107,477

STATE OF KANSAS, *Appellee*, v. JOAQUIN A. DEANDA, *Appellant*.

(324 P.3d 1115)

Opinion filed May 23, 2014.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause, and *Shawn E. Minihan*, of the same office, was on the brief for appellant.

*Linda J. Lobmeyer*, assistant county attorney, argued the cause, and *Susan Richmeier*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Following his guilty plea, Joaquin DeAnda was convicted of first-degree premeditated murder and sentenced to life without the possibility of parole for 50 years (hard 50). In this direct appeal of his sentence, DeAnda asserts the district court erred in admitting hearsay evidence at his sentencing hearing and in imposing a period of lifetime postrelease supervision. Further, DeAnda contends the district court's imposition of the hard 50 sentence violated his rights under the Sixth Amendment to the United States Constitution because a judge rather than a jury found the facts necessary to increase the mandatory minimum sentence.

Following our holding in *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014), we conclude Kansas' former statutory procedure for imposing a hard 50 sentence as provided in K.S.A. 21-4635 is unconstitutional. More specifically, the procedure utilized here violated the Sixth Amendment to the United States Consti-

tution as interpreted in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2162-63, 186 L. Ed. 2d 314 (2013), because it permitted a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt.

Based on this conclusion, we vacate DeAnda's hard 50 sentence and remand for resentencing. Therefore, we do not address DeAnda's claims of error regarding the admission of hearsay evidence at the sentencing hearing and imposition of an unauthorized lifetime postrelease supervision period. But, for purposes of remand, we consider and reject DeAnda's claim that the evidence was insufficient to support the aggravating circumstance.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2008, Garden City police discovered the body of 16-year-old J.Q. in a trash dumpster behind the home 17-year-old DeAnda shared with his mother. Following an investigation, the State charged DeAnda as a juvenile with first-degree murder, rape, and aggravated criminal sodomy. After a hearing, the district court certified DeAnda for adult prosecution and bound him over for trial on all charges.

Before trial, DeAnda entered into a plea agreement with the State, agreeing to plead guilty to one count of first-degree premeditated murder in exchange for the State's agreement to dismiss the remaining charges with prejudice, and the State reserved the right to seek a hard 50 sentence. At the plea hearing, defense counsel provided the following factual basis for DeAnda's guilty plea:

"[O]n December 13th of 2008, [J.Q.] arrived at the home of Joaquin De Anda and his mother, Margie Romero. They went down to his basement bedroom, which is downstairs of the home on Fourth Street here in Garden City, Finney County, Kansas. They watched a movie and visited for a while. At some point Mr. De Anda began to choke [J.Q.]. As he was choking her, he realized what he was doing could lead to her death, but continued to choke anyway until [J.Q.] fell unconscious, and Mr. De Anda believed she was dead.

"He then waited for [his mother and her friend], who were present in the upstairs portion of the home, to leave the home to attend some—a parade and

some other festivities in town. After they left, Mr. De Anda moved [J.Q.'s] vehicle from the front of his home to another location here in Garden City, Finney County, Kansas, came back, and then after several—I'm sorry, before—when he came back, before moving her body, he then stepped on her neck to make sure that she was dead. And then proceeded to attempt to get her body up the stairs unsuccessfully, but eventually got her up the upstairs portion to the main level of the house, and then drug her out to the backyard, and then placed her body into a dumpster in the back alleyway behind the house, where her body was later discovered on or about December 16th of 2008."

The district court accepted the plea and convicted DeAnda of first-degree premeditated murder. Before sentencing, the State filed notice of its intent to seek a hard 50 sentence, alleging DeAnda committed the murder in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f).

At the sentencing hearing, the State presented evidence from several witnesses to support the alleged aggravating circumstance. Detective Mark Johnson testified he found J.Q.'s body in a dumpster located behind the DeAnda residence and that J.Q. had bruising on her face and cut marks on her neck just below her chin.

Kathy Gill-Hopple, a sexual assault nurse examiner, examined J.Q.'s body before the autopsy and found three 1-millimeter abrasions on the posterior tissue of J.Q.'s vaginal opening. Gill-Hopple testified these abrasions were consistent with a sliding force injury. Further, Gill-Hopple testified she found three contusions, or bruises, at the juncture of J.Q.'s hymen and labia minora and that these contusions were not postmortem injuries.

Over DeAnda's objection, the State introduced an autopsy report and evidence about the cause and manner of J.Q.'s death through the testimony of Dr. Jamie Oeberst, the Sedgwick County district coroner and chief medical examiner. Another medical examiner, Dr. Bamidele Adeagbo, had performed the autopsy and had testified at DeAnda's preliminary hearing. But by the time of DeAnda's sentencing, Dr. Adeagbo was no longer employed by Sedgwick County.

Dr. Oeberst testified the manner of death was homicide and the cause of death was "asphyxia associated with blunt-force injuries." She described the blunt-force injuries as abrasions and contusions on J.Q.'s face, a contusion on the inside of the scalp on the top of

J.Q.'s head evidencing a blow to the head, and a hemorrhage on the anterior aspect of J.Q.'s cervical spine, evidencing "[p]ossibly a twisting motion" or "side-to-side or front-to-back" movement of the tissue around the spine.

According to Dr. Oeberst, some of J.Q.'s injuries, including "fingertip contusions" on her thighs, indicated a struggle preceded her death. Dr. Oeberst further testified J.Q. had multiple abrasions, scrapes, and contusions on her face, chest, abdomen, back, and extremities; postmortem incisions on her neck and arms; and postmortem burns on her back. Finally, Dr. Oeberst testified she reviewed microscopic slides of tissue samples from J.Q.'s vaginal contusions and concluded the vaginal contusions occurred "within probably a couple of hours" of J.Q.'s death but not after her death.

Kelly Edison, a psychologist formerly employed by Larned State Hospital, conducted a court-ordered mental evaluation of DeAnda and testified about DeAnda's statements to her during that evaluation. According to Edison, DeAnda said that on the night of J.Q.'s death, he and J.Q. were cuddling, listening to music, and making out when he began choking J.Q. because he wanted to be "Nick Gonzo." DeAnda explained to Edison that "Nick Gonzo" was not a real person but " 'the person [he] aim[ed] to be.' " J.Q. fought back but was unable to scream because DeAnda was choking her. After choking J.Q., DeAnda placed his hands on the ceiling to brace himself and stood on J.Q.'s neck to make sure she was dead. Then, before going upstairs to eat, he placed J.Q. in the bed to look as if she was sleeping. After his mother left the house, DeAnda returned to the basement and had sex with J.Q.'s dead body.

DeAnda also told Edison he hid J.Q.'s body under the bed and then took her bag and cell phone and drove her car to the zoo. After parking J.Q.'s car at the zoo, DeAnda walked back to his home, dragged J.Q.'s body across the floor, and dumped it in a trash dumpster.

Testifying for the defense, Dr. Corrie May, a forensic pathologist, identified numerous errors she found in the autopsy report, including the incorrect use of anatomic and technical pathology terms; multiple diagnoses of the same wound beneath the left col-

larbone; and a statement that "[t]he cervical vertebrae was . . . out of alignment," although x-rays showed the area as "normal." Dr. May also testified the autopsy report mislabeled several cuts on the body as stab wounds and failed to indicate the medical examiner performed the autopsy over the course of 2 days.

Dr. May agreed that J.Q.'s death resulted from asphyxiation and that sharp cuts across J.Q.'s throat were inflicted postmortem. According to Dr. May, she could not determine whether a sexual assault occurred, but she agreed that if DeAnda claimed he sexually assaulted J.Q., she had "no evidence to the contrary." Dr. May also testified she did not have all of the investigative lab reports, but she admitted that if the reports indicated the presence of DeAnda's semen in the vaginal wall, "common sense would tell you there must have been some sexual assault."

Dr. William Logan, a psychiatrist, testified for the defense that he reviewed DeAnda's mental health files, examined him on three occasions, and diagnosed DeAnda with major depressive disorder and schizophrenia. Dr. Logan testified DeAnda had been hospitalized on several occasions for mental health issues, including a hospitalization for a drug overdose 1 month before the murder.

According to Dr. Logan, at the time of sentencing DeAnda was taking several medications for depression, but Dr. Logan could not say whether DeAnda was taking any medications when he killed J.Q. However, Dr. Logan testified DeAnda was under the influence of extreme mental or emotional disturbances when he committed the crime and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired.

Specifically, Dr. Logan testified that at the time of the murder, DeAnda suffered from depression and struggled "with some psychotic thoughts about something that he needed to do to achieve what he called enlightenment . . . [and was] experiencing the idea that people could read his thoughts." Regarding DeAnda's capacity to understand the criminality of his actions, Dr. Logan testified that although DeAnda had a diminished capacity to "[u]nderstand it from a moral standpoint, I think he understood that what he did was legally wrong." However, Dr. Logan also clarified he was un-

certain DeAnda comprehended the illegality of some of his actions at the time they occurred. Finally, Dr. Logan opined: "I don't think [DeAnda] really truly appreciated [J.Q.] as another human being when he did this. I mean, she was more of an object to effect some kind of enlightenment or change."

Ultimately, the district court found DeAnda's conduct demonstrated beyond a reasonable doubt that DeAnda desecrated "the victim's body in a manner indicating a particular depravity of mind either during or following the killing." See K.S.A. 21-4636(f)(6) (providing State may demonstrate conduct that is "especially heinous, atrocious or cruel" by showing "desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing"). In its written findings, the court found DeAnda attacked J.Q. without warning and J.Q. either died as a result of the initial attack or she was "rendered insensible and never regained noticeable consciousness prior to her death." The court noted inconclusive evidence regarding whether J.Q. was alive at the time of the sexual assault but found "no evidence that [J.Q.] was in any way cognoscente [*sic*] of the assault and the likelihood was that she was at that time already dead." The court further found DeAnda "made three conscious attempts" on J.Q.'s life or body to insure she was in fact dead.

In mitigation, the court found beyond a reasonable doubt that DeAnda was 17 at the time of the crime and found by a preponderance of the evidence that DeAnda committed the crime while he was under the influence of extreme mental or emotional disturbances. The court ultimately imposed a hard 50 sentence after concluding the aggravating circumstance was not outweighed by the mitigating circumstances.

Our jurisdiction over DeAnda's direct appeal arises under K.S.A. 2013 Supp. 22-3601(b)(3) (life sentence imposed); see also *State v. Hall*, 292 Kan. 862, 866, 868, 257 P.3d 263 (2011) (reaffirming that this court lacks jurisdiction to consider direct appeal following guilty plea, but stating "[a] guilty plea does not surrender a defendant's right to appeal a sentence").

## Discussion

*The hard 50 sentencing scheme is unconstitutional.*

When DeAnda filed his appellate brief, he argued in part that Kansas' hard 50 sentencing scheme is unconstitutional under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because it does not require a jury to find the facts that increase the penalty beyond a reasonable doubt. DeAnda acknowledged that this court has consistently upheld the constitutionality of the hard 50 sentencing scheme, and the State argued we should do the same here.

But, as DeAnda's appellate counsel declared at oral argument, the "legal landscape" changed while DeAnda's appeal was pending. In June 2013, the United States Supreme Court held that any fact that increases a mandatory minimum sentence increases the penalty for a crime and therefore is an element that must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne*, 133 S. Ct. at 2155, 2162-63. DeAnda filed a letter of additional authority citing *Alleyne* to support his position that his hard 50 sentence was unconstitutional. See Supreme Court Rule 6.09(b) (2013 Kan. Ct. R. Annot. 50).

After oral argument in this case, this court in another case held Kansas' former statutory procedure for imposing a hard 50 sentence as provided in K.S.A. 21-4635 violated the Sixth Amendment to the United States Constitution because it permitted a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt. *Soto*, 299 Kan. 102, Syl. ¶ 9.

Based on *Soto* and its application of *Alleyne*, we conclude the district court violated DeAnda's Sixth Amendment right to a jury trial in imposing the hard 50 sentence using the K.S.A. 21-4635 statutory procedure.

*Under the facts of this case, we remand for resentencing.*

Notably, following *Alleyne* and before oral argument in this case, the Kansas Legislature conducted a special session to amend Kansas' hard 50 sentencing scheme. See L. 2013, ch. 1, sec. 1 (Special Session). The amended version of 21-6620 expressly provides for retroactive application in cases pending on appeal. K.S.A. 2013 Supp. 21-6620(c).

Although neither party briefed the issue, at oral argument the State suggested that if this court finds Kansas' former hard 50 statute unconstitutional under *Alleyne*, we should remand the case for resentencing under the amended statute, K.S.A. 2013 Supp. 21-6620. DeAnda's appellate counsel disagreed, suggesting the amended statute could not be applied retroactively.

We considered several questions related to the appropriate remedy for a hard 50/*Alleyne* error in *Soto*, and those considerations guide us here.

1. *The hard 50/Alleyne error in this case could not be held harmless.*

In *Soto*, we first considered whether hard 50/*Alleyne* errors can be subject to harmless error review, and we reasoned that if we were to apply a harmless error analysis, it would be a modified, stringent harmless error test. Specifically, we concluded a hard 50/*Alleyne* error could be harmless only if we conclude (1) beyond a reasonable doubt that uncontroverted and overwhelming evidence supported the aggravating circumstance such that the jury would have found the existence of the aggravating circumstance beyond a reasonable doubt, and (2) beyond a reasonable doubt that no rational jury would have determined that mitigating circumstances outweighed the aggravating circumstance. *Soto*, 299 Kan. at 126-27.

Ultimately, we declined in *Soto* to decide whether hard 50/*Alleyne* errors are subject to harmless error review because Soto did not present the rare circumstance in which an error could be held harmless. *Soto*, 299 Kan. at 127-28.

In this case, unlike *Soto*, the district court did find "beyond a reasonable doubt" that DeAnda's conduct demonstrated "[d]ese-

cration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing," under K.S.A. 21-4636(f)(6). Despite this finding, this case is like *Soto* in that it does not present the rare circumstance in which an error could be held harmless. That is because even if the facts of this case would permit us to conclude beyond a reasonable doubt that uncontroverted and overwhelming evidence supported the aggravating circumstance found by the judge such that the jury would have found the existence of that circumstance beyond a reasonable doubt, we could not reach the same conclusion as to the second part of the test.

DeAnda presented evidence of two strong mitigating circumstances—his young age, 17, and his history of significant mental illness. While the district court ultimately found these two factors did not outweigh the aggravating circumstance, we cannot say with any degree of certainty that a jury of 12 would have reached the same conclusion. See *Soto*, 299 Kan. at 127 (noting defendant's mitigation evidence precluded court from concluding no rational jury would have determined mitigating circumstances outweighed aggravating circumstance).

Thus, as in *Soto*, we decline to decide whether a hard 50/*Alleyne* error may be subject to harmless error review because this case does not present the rare instance in which such an error could be held harmless. Consequently, we vacate DeAnda's sentence and remand for resentencing.

2. *The appropriate course of action on remand remains an open question.*

*Soto* provides additional guidance as to whether the State may seek imposition of a hard 50 sentence on remand under K.S.A. 2013 Supp. 21-6620. There, we held that issues related to application of the amended hard 50 statute will not ripen unless and until the State seeks application of the amended statute on remand, and we thus declined to issue an advisory opinion. See *Soto*, 299 Kan. at 128-29. If that eventuality occurs, and if the parties so choose, they are free to present arguments to the district court regarding retroactive application of the amended statute.

3. *The evidence is sufficient to support the aggravating circumstance.*

Finally, because we cannot predict whether the State will seek a hard 50 sentence under the amended statute on remand, we will assume as much and address DeAnda's claim that the evidence is insufficient to support the aggravating circumstance found by the district court. See *Soto*, 299 Kan. at 129-30 (declining to decide whether State may seek application of K.S.A. 2013 Supp. 21-6620 on remand, but addressing defendant's challenge to sufficiency of evidence of aggravating circumstance); see also K.S.A. 2013 Supp. 21-6620(e) (providing that if hard 50 sentence imposed under prior version of statute "is vacated for any reason other than sufficiency of the evidence as to all aggravating circumstances, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence").

In light of *Alleyne*, our task is to consider whether, after review of all the evidence in a light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Soto*, 299 Kan. at 129. Here, the district court found DeAnda committed the murder in a heinous, atrocious, or cruel manner under K.S.A. 21-4636(f)(6). That subsection specifies that conduct is "especially heinous, atrocious or cruel" if the defendant desecrated the victim's body "in a manner indicating a particular depravity of mind, either during or following the killing."

In his plea, DeAnda admitted that after he killed J.Q. by choking her, he hid her body in his room for an unspecified amount of time, waited for his family to leave the house, stepped on J.Q.'s neck to make sure she was dead, drug J.Q.'s body up the stairs and through his backyard, and placed it in a trash dumpster behind his house. DeAnda did not contest this evidence at the sentencing hearing, and DeAnda's psychologist corroborated the evidence with her testimony about DeAnda's statements during a court-ordered mental evaluation.

As DeAnda suggests in his brief, the manner in which he disposed of J.Q.'s body after the murder is insufficient, standing alone,

to support a finding he committed the murder in an especially heinous, atrocious, or cruel manner under K.S.A. 21-4636(f)(6). See *State v. Buehler-May*, 279 Kan. 371, 388-89, 110 P.3d 425, *cert. denied* 546 U.S. 980 (2005) (suggesting defendant's acts of wrapping victim's body in a tarp, leaving it in a house for a day or two, and throwing it in a river did not necessarily demonstrate "particular depravity of mind" under K.S.A. 21-4636[f][6]).

But as the State points out, the evidence supporting the aggravating circumstance here was not limited to the manner in which DeAnda disposed of J.Q.'s body. Rather, the evidence presented at the sentencing hearing established DeAnda inflicted several postmortem injuries—specifically three incisions on J.Q.'s neck, incisions on her arms, and burns on her back. Further, DeAnda told Edison and Dr. Logan that he had sexual intercourse with J.Q.'s dead body.

DeAnda concedes in his brief that having sexual intercourse with a dead body likely constitutes "desecration" of a victim's body. But relying on *Buehler-May*, 279 Kan. at 389, DeAnda argues the State is required to demonstrate he intended to desecrate J.Q.'s body "in a manner indicating a particular depravity of mind, either during or following the killing." Further, DeAnda reasons, "[b]esides the act of sexual intercourse, he did not do anything particularly heinous or morally horrendous to the body."

But this court in *Buehler-May* did not append an intent requirement to K.S.A. 21-4636(f)(6). Instead, the court held "a defendant's actions must be heinous to a great degree to meet the threshold for this factor to apply." 279 Kan. at 389. Even if DeAnda's postmortem acts of stepping on J.Q.'s neck, cutting her neck in three places, and inflicting burns on her body are insufficient evidence of desecration in a manner demonstrating a particular depravity of mind, we have no hesitancy in finding that a rational factfinder could conclude beyond a reasonable doubt that DeAnda's act of having sexual intercourse with what he believed to be J.Q.'s dead body was heinous to a great degree, demonstrating the particular depravity of mind contemplated by K.S.A. 21-4636(f)(6).

In sum, viewing the evidence in the light most favorable to the prosecution, we conclude a rational factfinder could have found beyond a reasonable doubt that DeAnda committed the murder in an especially heinous, atrocious, or cruel manner under K.S.A. 21-4636(f). Thus, we vacate DeAnda's sentence and remand for re-sentencing for the sole reason that his sentence was imposed in violation of his Sixth Amendment right to a jury trial.

*We need not fully address DeAnda's remaining issues.*

Finally, because we are vacating DeAnda's hard 50 sentence, we necessarily vacate the unauthorized order of lifetime postrelease supervision imposed as part of his off-grid indeterminate life sentence. See *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011) ("[A] sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence."). And our remand for a new sentencing hearing moots DeAnda's claim that the district court erroneously admitted hearsay evidence at the sentencing hearing.

Sentence vacated and case remanded for resentencing.