No. 83,361

STATE OF KANSAS, *Appellee*, v. JAMES CRUME, JR., *Appellant*.

(22 P.3d 1057)

Opinion filed April 20, 2001.

*John Jenab*, of Jenab & Kuchar, of Olathe, argued the cause, and *Alice A. Craig*, of the same firm, was on the brief for appellant.

*Bonnie Hannan*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J: Defendant, James Crume, Jr., convicted of first-degree premeditated murder and sentenced to life imprisonment, appeals his conviction, claiming the trial court erred by: (1) violating his right to due process by a pre-indictment delay of 17 years; (2) failing to instruct the jury as to the testimony of an accomplice; (3) finding that his statements were voluntarily and knowingly made; and (4) not granting a mistrial for the prosecutor's violation of an order in limine.

On July 22, 1981, James Atkerson arose in the early morning hours. Atkerson left his home in Kansas City, Kansas, for work at the General Motors plant in Fairfax, Kansas, in a light beige 1976 Pontiac LeMans. Atkerson did not carry a wallet. He wore a Timex watch on his left wrist. Atkerson's car was found later that morning parked on the side of the entrance ramp to I-635 at Parallel Parkway with the engine running. Atkerson was in the front driver's seat of the car with a gunshot wound to his face. He was pronounced dead at the scene. The passenger side front widow had been shot out. The glass was laying outside the car.

Investigating officers interviewed a witness, Elizabeth Pinzon, who had reported seeing two cars parked on the ramp in the early morning hours of July 22, 1981. Pinzon had noted several Caucasian men standing around the two cars. Pinzon did not observe any hostility and considered stopping to offer assistance, but she decided to proceed because there were sufficient people to handle the problem. During the investigation, Pinzon submitted to hypnosis in an effort to remember more details. The hypnosis was not successful. She also assisted in developing a composite drawing of one of the men she had observed standing around the cars. Based on Pinzon's information, police officers identified a person that worked with Atkerson at General Motors as a possible suspect. However, after some initial investigating, the detectives found that suspect had an alibi for the morning of the shooting.

Police also received several hotline tips suggesting James Crume, Jr., was involved in Atkerson's death. Herman Van Littrice called the police hotline several times with information about the inci-

dent. In February 1982, Van Littrice named Crume as the shooter. Van Littrice's information allegedly came from Jerome White, the brother of Melvin White, who 17 years later became the primary witness against Crume. The investigation of Atkerson's death became dormant.

In June 1998, Melvin White, who was in the Wyandotte County jail awaiting trial on an aggravated assault charge, wrote a letter to the Wyandotte District Attorney informing the district attorney that he had information on an old murder case that occurred in 1981. White explained in the letter that the murder had been bothering his conscience; he had joined a church and wanted to disclose what he knew regarding the murder. The district attorney dispatched an officer to the jail to take White's statement.

White informed the officer that he knew Crume in the early 1980's. One night, Crume came by White's house and asked White to go with him to find a mutual acquaintance, Michael Peterson. Crume was driving a blue and white Malibu. When Crume and White arrived at the Peterson home, Peterson was not home.

On the way back to White's house, Crume's car bumped into the rear of a light-colored car which was stopped at a stoplight near an entrance ramp of a highway. When the light turned green, the car ahead of Crume's turned left onto the highway. Crume followed and again bumped the car. The driver of the other car pulled over on the entrance ramp. Crume bumped the car a third time, causing the car to skid slightly. Crume then exited his car and went to the driver's side of the other car. The other driver did not get out of his car. After the two men had a brief conversation, Crume returned to his car, reached into the front seat of his car and grabbed his pistol. Crume then returned to the driver's side of the other car and shot the pistol toward the head of the driver. Crume saw fire emit from the gun and blood splatter upward. Crume then reached into the car and took a gold watch and some papers and returned to his own car. White told Crume to take him home.

White told the officer that after he returned home, he went to a neighbor's house to tell his neighbor what had happened, and he slept at his neighbor's house that night. The next day, White told his girlfriend and his brother about the shooting.

Subsequent to making his statement in Wyandotte County jail, White pled guilty to the aggravated assault charge. White's attorney requested a downward departure. The State did not argue against the disposition. White was sentenced and placed on probation.

Based primarily on White's statement, an information was filed in Wyandotte County, charging Crume with the first-degree murder. Crume was found guilty of first-degree murder and sentenced to life imprisonment. Crume appealed. We have jurisdiction pursuant to K.S.A. 22-3601(b)(1).

### Pretrial Delay

Prior to trial, Crume moved to dismiss the charges because of a 17-year pre-indictment delay. The motion was heard and overruled prior to trial. Crume renewed the motion post trial. The motion was overruled. On appeal, Crume contends that the 17-year pre-indictment delay violated his right to due process.

To prosecute a defendant following investigative delay does not deprive the defendant of due process, even if the defense might have been somewhat prejudiced by the lapse of time. *United States v. Lovasco*, 431 U.S. 783, 796, 52 L. Ed. 2d 752, 97 S. Ct. 2044 (1977). A showing of prejudice, while necessary to support a due process claim, is not sufficient in itself. Rather, a "due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790. Governmental delay solely to gain tactical advantage over the accused would violate due process. 431 U.S. at 795.

Two questions are considered in testing whether there has been an impermissible encroachment of defendant's due process rights: (1) Has the delay prejudiced the accused's ability to defend, and (2) was the delay a tactical device to gain advantage over the defendant? Both questions must be answered in the affirmative before it may be said that criminal charges should be dismissed. *State v. Royal*, 217 Kan. 197, 202, 535 P.2d 413 (1975).

Crume asserts that both of these questions are answered in the affirmative. Crume first argues that he was prejudiced by the delay because his grandfather, who passed away during the 17-year delay, would have been an alibi witness and second, the delay was the

result of the State's inexplicable and deliberate failure to follow up on leads it obtained immediately after the shooting. Crume concludes that because memories faded and witnesses disappeared, the passage of time made it more difficult for him to conduct a defense.

At the pretrial hearing on the motion to dismiss, Crume stated that his deceased grandfather *may have been able to provide* an alibi for him. The judge asked Crume if he had any evidence that he (Crume) was in Mississippi in July 1981. Crume answered that he could not remember the exact date of his visit to his grandfather in Mississippi.

Crume next points to the failing memories of Pinzon and White as prejudice suffered due to the pre-indictment delay. Referring to Pinzon, Crume, who is black, asserts that he could not fully utilize Pinzon as a witness due to the passage of time and her fading memory. As to White, Crume merely argues that due to the length of the pre-indictment delay, White's statements were difficult to refute.

We note that Crume does not specify how he could have used Pinzon's testimony more effectively had her memory been clearer, or how he could have refuted White's testimony closer in time to the commission of the crime. Crume also questions White's motivation in offering evidence but does not express how White's motivation bears on the prejudice due to pre-indictment delay. Crume's allegations of prejudice to his right to a fair trial do not rise above speculation.

To support his claim that the delay was a deliberate attempt by the State to gain a tactical advantage in the prosecution of the case, Crume recites the instances where the police failed in the 1981 investigation of the murder to follow tips identifying Crume as the perpetrator.

In 1981 the officers investigating this crime took hotline tips, made road stops to inquire of motorists whether they had witnessed anything unusual, and followed up tips provided by tipsters and information supplied by motorists. Crume was identified as a possible suspect. Pinzon assisted in making a composite sketch of a person she observed by the highway on the morning of the shoot-

ing. In an effort to gain further information police officers had her hypnotized. The leads did not result in a prosecution.

Perhaps, in hindsight, the police should have concentrated their efforts on leads that would have led to Crume as the shooter; however, Crume has not shown that the failure to do so was motivated by a desire by the police to delay prosecution in an effort to obtain a tactical advantage. Crume has failed to show that he suffered prejudice by the pre-indictment delay.

## Instruction Regarding Testimony of an Accomplice

The accomplice instruction found at PIK Crim. 3d 52.18 (1996 Supp.) provides: "An accomplice witness is one who testifies that (he) (she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice witness."

The district judge did not give an accomplice instruction regarding White's testimony. Crume, who did not object to the failure to instruct at the trial level, now on appeal contends that the trial court's failure to give an accomplice instruction was reversible error. We have previously stated:

" ' "The warning [accomplice instruction] is never an absolute necessity. It is usually desirable to give it; in close cases it may turn the scale; but it is at most merely a part of the general conduct of the trial, over which the judge's powers are discretionary, like his control over cross-examination, or his comments on the evidence. If he thinks it unnecessary—at least when, as here, the guilt is plain— he may properly refuse to give it." ' " *State v. DePriest*, 258 Kan. 596, 606, 907 P.2d 868 (1995) (quoting Judge Learned Hand in *United States v. Becker*, 62 F.2d 1007, 1009 [2d Cir.1933]).

If the defendant does not request an accomplice instruction at trial, the failure to give an accomplice instruction requires reversal only if clear error occurred. *State v. Thomas*, 252 Kan. 564, Syl. ¶ 7, 847 P.2d 1219 (1993).

The State argues that an accomplice instruction was unnecessary. To support its argument, the State relies on *State v. Thomas*, 252 Kan. 564. In that case, Thomas borrowed a rifle from friends and indicated that he was going hunting. The next evening, Eddie and Earl, two brothers of Thomas' girlfriend, went with Thomas

to obtain rock cocaine. Thomas had told one of his girlfriend's brothers and others that someone had previously sold him bad cocaine or drugs.

Thomas pulled into a driveway next to a recreation center and asked a man standing nearby if he had cocaine. The man replied yes. Thomas got out of the car, reached into the back seat, and pulled out a gun. Earl testified that when Thomas aimed the gun at the man, the man started to run to the back of a building. Thomas pursued. Several shots were fired. When Thomas returned to the car he showed Eddie some crack rocks. Earl asked Thomas if he shot the man. Thomas replied that he had. Veotis Richmond's death was reported on the five o'clock evening news. After seeing the news report, Earl asked Thomas, "Do you know you killed him?" Earl testified that Thomas replied, "It's just another nigger dead." 252 Kan. at 567. At trial, neither Eddie nor Earl were able to describe the man they had seen that evening.

At trial, Thomas did not request an instruction on accomplice testimony. On appeal, Thomas argued that the testimony of Eddie and Earl was suspect because both men accompanied Thomas that night. Thomas contended that both men could be deemed aiders and abettors because there was some evidence that Earl and Eddie were aware that their mission was to find the seller of bad drugs. The *Thomas* court found that the evidence suggested the trip was either unexpected or a detour taken by Thomas because he had been sold bad drugs. Therefore, the court concluded that Thomas was not entitled to an accomplice instruction. 252 Kan. at 579.

Here, there is evidence that White may have participated in the crime committed by Crume. Pinzon had testified there were several men standing around the cars. Crume asserts that this testimony contradicts White's testimony that Crume alone approached the victim's car and suggests that White may have been involved in the crime. Crume argues that based on this evidence, the judge erred in failing to give an accomplice instruction.

Crume did not request an accomplice instruction. The failure to give an accomplice instruction is not reversible error if the defendant's guilt is plain, *DePriest*, 258 Kan. at 606, or if the judge provided another instruction which cautioned the jury about the

weight to be accorded testimonial evidence. *State v. Moody*, 223 Kan. 699, 703, 576 P.2d 637, *cert. denied* 439 U.S. 894 (1978).

The trial judge gave a general instruction regarding the weight and credit to be given to the testimony of each witness. Instruction No. 4 provides:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness testified."

In *Moody*, the defendant's accomplice testified against the defendant. The accomplice's testimony evidence was partially corroborated. The trial court believed that under such circumstances, an accomplice instruction would be an improper comment by the court on the credibility of the evidence. The *Moody* court found that the trial court's refusal to give the accomplice instruction in that case was error but held that the credibility of witness instruction given the jury was sufficient. 223 Kan. at 702-03.

Here, the trial judge's credibility of witness instruction to the jury, coupled with the corroborating testimony of other witnesses, was sufficient. An accomplice witness instruction was not required.

### Witness' Personal Benefit

Crume next asserts that White's testimony was suspect because White was granted probation rather than imprisonment in White's aggravated assault case. We note that the same argument was made to the trial judge in the pretrial hearing on a motion to suppress White's testimony. When denying the motion to suppress, the judge pointed out that during cross examination, Crume could impeach White's testimony with information regarding leniency White received in exchange for his testimony. White's credibility was questioned during cross-examination by defense counsel and argued to the jury. The benefit White may have received in anticipation of his testimony in this case is not related to the role of an accomplice.

### Defendant's Statements

Prior to Crume's trial, the judge conducted a *Jackson v. Denno* hearing as to the admissibility of Crume's statement to police of-

ficers in June 1998. Before questioning Crume, the officer read to Crume an Advice of Rights form. The officer then gave Crume the form and asked Crume to read the form and sign it. Crume refused to sign the form.

Although Crume had refused to sign the waiver of rights form, the officer questioned Crume about his involvement in the Atkerson homicide. Crume stated to the officer that he (Crume) may have been involved in the homicide, but he could not remember because in 1981 he was on three types of drugs. After making the statement, Crume again refused to sign the written waiver document.

Crume testified at the hearing to suppress that he had made no statement to the police. Crume stated that he told the interviewing officers that he (Crume) had nothing to say and if he was going to be charged with a murder, he wanted a lawyer. Crume stated that the officer then began asking questions regarding the color of his car and the identity of his friends. Crume claimed that he had again refused to sign the form or make a statement to the officer without an attorney present. Crume testified that the officers continued to question him. Crume denied he told the officer that he could have committed the murder in 1981.

The judge found that Crume's statement was not "very incriminating," then balanced the credibility of the officer who testified that Crume made the voluntary statement against Crume's assertion that he made no statement. The judge determined that the statement would be admitted and the jury could weigh the credibility issues.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed.2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held the prosecution cannot use statements, whether inculpatory or exculpatory, stemming from custodial interrogation, unless it proves that procedural safeguards were used to secure the defendant's privilege against self-incrimination. These safeguards include informing the person in custody, prior to interrogation, of his or her Fifth Amendment rights to remain silent, to consult with an attorney, and to have an attorney present during interrogation. Further, if the person in custody states that he or she wants an attorney, all

questioning must cease until the attorney is present. 384 U.S. at 444-45; *State v. Cady*, 254 Kan. 393, 402, 867 P.2d 270 (1994). A waiver of *Miranda* rights need not be in writing. *State v. Williams*, 268 Kan. 1, 13, 988 P.2d 722 (1999).

Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether it was the product of the free and independent will of the accused. A statement may be considered voluntary if the accused was not deprived of the free choice to admit, deny, or refuse to answer. *State v. Lane*, 262 Kan. 373, 385, 940 P.2d 422 (1997).

Crume testified at the *Jackson v. Denno* hearing that he was intimidated or coerced into giving a statement. Crume asserts that his status as an incarcerated inmate is a factor weighing in favor of finding that his statement was not voluntary. Crume also points out that, unlike an unincarcerated citizen, he was not free to walk out of the interview. He also points out that there is no evidence in the record regarding his intelligence or ability to understand his rights.

The sole issue before the judge at the *Jackson v. Denno* hearing was whether Crume made the statement voluntarily. The issue of the voluntariness of the statement was determined by the judge. Crume's claim was that he had made no statement to the police.

When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence. *State v. Lewis*, 258 Kan. 24, 36, 899 P.2d 1027 (1995). The trial judge's admission of Crume's statement is supported by substantial evidence.

On appeal, Crume additionally argues that because the State did not introduce the written waiver of rights form into evidence at the *Jackson v. Denno* hearing, it failed to lay a sufficient foundation

for admission of the statement. An issue not presented to the trial court will not be considered for the first time on appeal. *State v. Smith*, 268 Kan. 222, 242-43, 993 P.2d 1213 (1999).

## Violation of an Order in Limine

The State did not file a K.S.A. 60-455 motion to admit evidence of Crume's statement of a prior bad act. Prior to trial, the defense counsel requested and the court issued an order in limine, excluding testimony of Crume's prior criminal conduct.

During the trial there were three violations of the judge's order. The first violation occurred when White was asked by the prosecutor why Crume picked him up the night of the shooting. White replied that Crume wanted his help to find Michael Peterson. The prosecutor then asked White, "And why did he need you to find Michael Peterson?" White replied, "Because [Crume] and [Peterson], they did a house burglary and [Crume] said he heard [Peterson] had took some money and hid a pistol from him." Defense counsel objected and moved for a mistrial. The prosecutor explained to the judge that it was not the State's intention for the witness to answer as he did. The prosecutor stated that he had anticipated that the witness would answer that he was familiar with Peterson's whereabouts and Crume was not. The judge denied the mistrial motion and instructed the jury to disregard the answer of the witness.

The second violation of the order in limine occurred when the next witness for the State, former Kansas City Police Detective Kenneth Allen, testified on direct examination regarding a statement he took from Melvin White regarding the 1981 homicide of James Atkerson. Allen testified White said:

"[Crume] told me that back in 1980 or '81 that he was with a party by the name of James Crume. He stated that they had went to—they was going to a friend of James Crume's house and that they had been pulling some burglary and that Mr. Crume was upset—"

Defense counsel immediately objected and moved for a mistrial. The prosecutor stated that the information about the burglary was unsolicited and that the burglary information was not included in the detective's written statement. The trial court denied the motion

and instructed the jury to disregard Allen's last statement. The court then admonished the prosecutor to be more careful in direct examination. Neither witness was asked by the defense attorney or the trial judge if the prosecution had informed the witnesses of the court's order in limine.

The third violation of the order in limine occurred during deliberations. The jury requested a readback of White's direct examination testimony. The court reporter read back the testimony, including White's statement that violated the order in limine. The defense counsel objected a third time and again requested a mistrial. The judge found that the court reporter's mistake was inadvertent and, in view of the evidence against Crume, the third violation was also harmless.

## Motion in Limine

To understand the nature of a motion in limine and its purpose, we refer to *State v. Quick*, 226 Kan. 308, 597 P.2d 1108 (1979), *disapproved on other grounds State v. Jackson*, 244 Kan. 621, 772 P.2d 747 (1989). The *Quick* court noted that Black's Law Dictionary 896 (4th ed. rev. 1968) defines in limine as: "On or at the threshold; at the very beginning; preliminarily." This term has been loosely used in practice to designate almost any motion filed and to be ruled on before trial. In recent years the use of the motion in limine has gained general acceptance. See Annot., 63 A.L.R.3d 311. The phrase "motion in limine" is not found in the procedural statutes of Kansas. See K.S.A. 60-207 and K.S.A. 22-3208, which relate to pleadings and motions generally. Authority for the use of the motion in limine in many states is found in "the inherent power of the trial court to exclude or admit evidence." *Burrus v. Silhavy*, 155 Ind. App. 558, 563, 293 N.E.2d 794 (1973). Other courts have found authority for the motion in procedural rules such as Fed. R. Civ. Proc. 16 which gives the federal trial courts broad authority to conduct pretrial conferences. See *Aley v. Great Atlantic & Pacific Tea Co.*, 211 F. Supp. 500, 503 (W.D.Mo. 1962).

In Kansas, our trial courts in both criminal and civil cases have broad authority to conduct pretrial conferences to consider such

matters as will promote a fair and expeditious trial and to consider various matters as may aid in the disposition of the action. See K.S.A. 22-3217 and K.S.A. 2000 Supp. 60-216. The Kansas Code of Civil Procedure was patterned after the federal rules. The *Quick* court concluded that there can be little doubt that the trial courts in Kansas have authority to entertain a motion in limine by reason of the pretrial authority conferred by statute.

*Quick* then noted that the purpose of a motion in limine is to assure all parties a fair and impartial trial by prohibiting inadmissible evidence, prejudicial statements, and improper questions by counsel. It is generally agreed that a protective order issued on a motion in limine should be granted only when the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer of or statements made during trial concerning the material will tend to prejudice the jury. See Rothblatt & Leroy, *The Motion in Limine in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence*, 60 Kentucky L.J. 611, 621 (1972); and Davis, *The Motion in Limine—A Neglected Trial Technique*, 5 Washburn L.J. 232 (1966). The material to which the motion in limine is addressed may be either inadmissible under an established rule of evidence, such as the hearsay rule, or it may be excludable under a statute, such as K.S.A. 60-445, because its probative value is substantially outweighed by its tendency to prejudice.

Although the primary purpose of the motion in limine is to prevent prejudice during trial, its use should be limited to accomplish that purpose. It is therefore important that a proper written motion pinpoints the material or evidence to be protected against. This is necessary together with an order of the court setting forth the specific basis for exclusion or admission. A mistrial or reversible error on appeal may be avoided by having a proper motion and order drawn and filed. See *Proper v. Mowry*, 90 N.M. 710, 568 P.2d 236 (1977).

The order resulting from a motion in limine may prohibit reference during trial proceedings to material which is irrelevant or

prejudicial to a fair trial. The order is a temporary protective order and is subject to change during the trial. Annot., 63 A.L.R.3d 311.

Although the prosecuting attorney's paramount obligation is to the public, it is not enough to be intent on the prosecution of the case; the prosecutor must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, the prosecutor's mission is not so much to convict as it is to achieve a just result. Although the accused must be prosecuted with earnestness and vigor, the prosecutor must always be faithful to the state's overriding interest that justice be done; the prosecuting attorney is the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. It is as much the prosecutor's duty to see that a person on trial is not deprived of any of his statutory or constitutional rights as it is to prosecute the defendant. Nonetheless, zeal in the prosecution of criminal cases is to be commended and not condemned. If convinced of the defendant's guilt, the prosecuting attorney should, in an honorable way, use every available power to secure the defendant's conviction. At the same time, it is the prosecutor's duty to remain under appropriate restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled, and it is as much a prosecutor's duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one. *State v. Cady*, 248 Kan. 743, 811 P.2d 1130 (1991) (quoting 63A Am. Jur. 2d, Prosecuting Attorneys § 26 [now 63C § 23]).

Whether there is an order in limine or not, a prosecutor has the duty to guard against statements by his or her witnesses containing inadmissible evidence. If the prosecutor believes a witness may give an inadmissible answer during his or her examination, the prosecutor must warn the witness to refrain from making such a statement. *People v. Warren*, 45 Cal. 3d 471, 482, 247 Cal. Rptr. 172, 754 P.2d 218 (1988).

When specific guarantees of the Bill of Rights are involved, trial courts must exercise special care to ensure that prosecutorial conduct does not impermissibly infringe upon those guarantees. In

evaluating a prosecutor's alleged violation of a motion in limine, the court first must determine whether an intentional or inadvertent violation of the order in limine occurred. Outside the presence of the jury, the defendant's attorney should inquire if the prosecutor warned or failed to warn the witness to refrain from making such a statement. The prosecutor must then articulate the reason for the violation.

When a motion in limine is taken under advisement by the court, the matter should not be raised except in the absence of the jury. Care must be exercised during trial because prejudice may be implanted in the minds of the jurors by attorneys asking unanswered questions and by witnesses making statements which are subsequently stricken.

If the order in limine is violated, there must be a determination by the trial judge as to whether the material elicited in violation of the order substantially prejudiced the defendant's right to a fair trial. *State v. Heath*, 264 Kan. 557, 581, 957 P.2d 449 (1998). Three factors should be considered to determine whether a new trial should be granted because of a prosecutor's violation of an order in limine. First, was the prosecutor's misconduct so gross and flagrant as to prejudice the jury against the defendant? Second, does the admission of the statement indicate ill will by the prosecutor? Third, is the evidence against the defendant so overwhelming there was little or no likelihood the prosecutor's violation or the order in limine changed the result of the trial? *State v. Follin*, 263 Kan. 28, 45, 947 P.2d 8 (1997).

In light of the evidence against Crume, the information regarding Crume's prior bad acts did not substantially prejudice the defendant's right to a fair trial.

Affirmed.