NOT DESIGNATED FOR PUBLICATION

No. 113,181

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYLER A. RUHL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOSEPH BRIBIESCA and DEBORAH HERNANDEZ MITCHELL, judges. Opinion filed February 15, 2019. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., ATCHESON and POWELL, JJ.

PER CURIAM: A jury sitting in Sedgwick County District Court convicted Defendant Tyler A. Ruhl of attempted first-degree murder, attempted aggravated robbery, and criminal possession of a firearm. On appeal, Ruhl contends jury instructions on the attempted murder charge and a lesser included offense confused the jurors, the district court erred in denying his pretrial motion for a new lawyer, and his lawyer failed to competently represent him during the trial. Among those complaints we find nothing warranting relief for Ruhl and, therefore, affirm his convictions and sentence.

1

FACTUAL AND PROCEDURAL HISTORY

Given the focused and largely self-contained issues on appeal, we need not delve deeply into the trial evidence, including the somewhat extended sequences of events that led to the shooting of Timothy Gurley at his home in Wichita. We offer an abbreviated narrative, recognizing that the parties are well versed in the details.

Gurley owned a small construction company and hired crews to perform subcontracts for roofing, siding, and demolition on larger jobs. From time to time, Travis Sites and Heath Vaughn worked for Gurley. Ruhl hung around with Sites and Vaughn but never worked for Gurley. Sites and Vaughn had a simmering feud with Gurley during the summer of 2013 because he hadn't paid them for a job. Gurley kept explaining the general contractor hadn't paid him and he would take care of them when he received his money.

In late August 2013, Sites and Vaughn confronted Gurley at his house and demanded they be paid. As their verbal exchange escalated in volume and profaneness, Ruhl jumped in to threaten Gurley with physical harm. Sites and Vaughn decided to stand down and figuratively had to drag the still aggressive Ruhl away. Gurley paid Sites and Vaughn part of what he owed them within a few days.

On September 6, Sites and his live-in girlfriend hosted a party that Vaughn and Ruhl, among others, attended. Sites and Ruhl left together around midnight. Gurley was shot about five hours later. The jurors heard conflicting accounts of Ruhl's whereabouts during that time.

Ruhl told the jurors Sites drove him to his aunt's home, where his mother was staying. Ruhl said he spent the night there and didn't leave until the next morning. Both

2

Ruhl's aunt and mother confirmed that account. Some aspects of Ruhl's trial testimony differed from what he had told law enforcement officers investigating Gurley's shooting. But the gist of his version remained constant—he was sleeping at his aunt's home when Gurley was shot.

Gurley testified that his girlfriend was awakened about 5 a.m. by loud knocking on the front door and, in turn, awoke him. The knocking got louder and more persistent. Gurley opened the door to see Sites standing on the porch. Sites loudly and profanely demanded the rest of his money. As the two argued, Gurley saw a man he described as over 6 feet tall with a bandana across his face step onto the porch. The man pointed a handgun at Gurley and fired a single shot, striking Gurley in the torso. Gurley staggered back inside and collapsed. As a result of the shooting, Gurley was hospitalized for nearly a month and remains paralyzed from the waist down. Gurley never could identify the shooter, although he was sure Sites did not fire the gun.

Sites entered into an agreement with the State to plead to aggravated battery and attempted aggravated robbery and to testify at Ruhl's trial. Sites told the jurors he and Ruhl met Shannon Harden and Kara Aukes and went to the women's home where they drank and smoked methamphetamine. While they were there, Harden produced a handgun wrapped in a black bandana. The four, along with the gun, drove around northcentral Wichita and, at Sites' direction, wound up at Gurley's house. Sites and Ruhl went to the house. The women remained in the car parked across the street. Sites testified that Ruhl shot Gurley.

Harden entered pleas to charges of attempted aggravated robbery, aggravated battery, and criminal possession of a firearm. She testified at Ruhl's trial, although that was not a condition of her plea agreement with the State. Harden's account generally paralleled Sites' testimony. She told the jurors that after they parked the car near Gurley's house, she was in the driver's seat. When Ruhl and Sites ran back to the car, she drove

3

away. Harden told the jurors that as Ruhl got back in the car, he exclaimed, "I shot him in the heart."

After hearing evidence in the five-day trial in late August and early September 2014, the jurors considered these charges against Ruhl:  (1) attempted first-degree murder with a lesser included charge of attempted intentional second-degree murder and an alternative charge of aggravated battery, all related to the shooting of Gurley; (2) attempted aggravated robbery; and (3) criminal possession of a firearm. The presiding juror marked the verdict form to show Ruhl guilty of both attempted first-degree murder and attempted second-degree murder and of aggravated battery, attempted aggravated robbery, and the firearms offense. The verdicts were published that way, and in a poll, each juror confirmed those verdicts.

At a later hearing, the district court imposed a controlling prison term of 661 months on Ruhl, consisting of consecutive sentences of 618 months for attempted first-degree murder, 34 months for the attempted aggravated robbery, and 9 months for criminal possession of a firearm. The district court discarded the conviction on the alternative charge of aggravated battery. The district court placed Ruhl on postrelease supervision for 36 months and ordered that he register as a violent offender upon his release from prison. Ruhl, Sites, and Harden were jointly and severally liable for nearly $24,000 in restitution due the Crime Victims Fund for a payment it made to Gurley. This court granted Ruhl's motion to appeal out of time.

LEGAL ANALYSIS

*Jury Instructions on Attempted First-Degree Murder*

Ruhl contends the district court's written instructions to the jurors explaining how to deal with the attempted first-degree murder charge and the lesser included offense of

4

attempted intentional second-degree murder were contradictory and, thus, impermissibly confusing. One of the instructions was modeled on PIK Crim. 4th 68.080 that generally addresses lesser included offenses. The instruction informed the jurors that Ruhl could be convicted of one of the two attempted murder charges. And it explained that if the jurors had a reasonable doubt about his guilt of one rather than the other, then they should convict on the lesser crime of attempted second-degree murder. The instruction also reminded the jurors they had the option of finding Ruhl not guilty. Another instruction, drawing language from PIK Crim. 4th 54.140 on second-degree murder, advised the jurors to consider attempted second-degree murder only if they could not agree Ruhl was guilty of attempted first-degree murder.

Basically, Ruhl says one instruction required the jurors to consider the two charges simultaneously and the other required them to consider the charges sequentially, so they would not even look at attempted second-degree murder if they found the State proved the elements of attempted first-degree murder. And he now complains the sequential approach unfairly kept the jurors from considering attempted second-degree murder, depriving him of a fair trial.

Ruhl, however, faces an insurmountable hurdle in asking us to review these instructions for error. His lawyer asked the district court to give the instruction incorporating the language from PIK Crim. 4th 54.140. A party cannot invite the district court to give a particular jury instruction at trial and then argue on appeal that the very same instruction deprived him of a fair trial. *State v. Fleming*, 308 Kan. 689, 699, 707, 423 P.3d 506 (2018). As a general rule, appellate courts will not review such invited error. *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). The general rule applies here and precludes any possible relief for Ruhl on this point.

Even so, we fail to see how Ruhl was substantially prejudiced if the jurors considered the charges sequentially. A problem arises in sequential consideration of

5

related charges when an element of a lesser offense entails a circumstance, typically an intent or state of mind, that would negate an element of the greater offense. Unless the two are considered together, the defendant may be deprived of fair consideration of the circumstance amounting to a defense to the greater charge.

But we don't have that sort of situation here, given the elements of attempted first-degree murder and of attempted intentional second-degree murder. The relevant elements of attempted intentional second-degree murder required the State to prove Ruhl had the intent to kill Gurley when he fired the handgun and he failed in carrying out that intent. The relevant elements of attempted first-degree murder required the State to prove Ruhl had the same intent to kill Gurley when he fired the handgun, that he acted with premeditation, and that he failed in carrying out the intent. The only difference between the two is the State's obligation to prove the additional element of premeditation to convict of attempted first-degree murder. So proving the elements of attempted intentional second-degree murder would be entirely consistent with the elements of first-degree murder. In other words, if the jurors were convinced beyond a reasonable doubt that Ruhl was guilty of attempted first-degree murder, then they would also have to be convinced he was guilty of attempted second-degree murder, since each element of attempted second-degree murder replicates an element of attempted first-degree murder and would in no way be a defense to attempted first-degree murder.

Ruhl's argument does not otherwise call into question the conviction for attempted first-degree murder.

*Denial of Motion for New Lawyer*

Five days before trial, Ruhl personally drafted and filed a motion asking the district court to appoint him a new lawyer. In the motion, Ruhl claimed his trial lawyer failed to consult with him sufficiently to permit him to assist in his own defense, failed to

6

investigate potentially exculpatory evidence, continued to negotiate for a plea despite his assertion of his innocence, and requested continuances without permission. The allegations in the motion, though rather generally stated, would, if true, suggest a conflict between Ruhl and his trial lawyer, since they are indicative of substandard representation. The district court promptly held a hearing to inquire of Ruhl and the lawyer about the situation and then denied Ruhl's request.

Indigent criminal defendants are constitutionally entitled to adequate legal representation. But they are not entitled to pick specific lawyers to represent them or to obtain substitute lawyers absent good cause. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014). A defendant should be appointed a replacement lawyer for "justifiable dissatisfaction," entailing an actual conflict of interest with his or her present lawyer, an irreconcilable disagreement with the lawyer, or a complete breakdown in communication. *State v. Pfannenstiel*, 302 Kan. 747, 759-60, 765, 357 P.3d 877 (2015). If a defendant raises a colorable claim of justifiable dissatisfaction with his or her appointed lawyer, the district court must inquire further into the factual bases for the purported friction. *Brown*, 300 Kan. at 575.

The district court need not appoint the defendant a separate lawyer for this initial inquiry and may question the defendant about the circumstances prompting the request. In turn, the defendant's lawyer may address those circumstances by providing additional factual information about the representation. The lawyer should (and is probably obligated to) offer relevant facts to the district court, even if they conflict with the defendant's account. But the lawyer cannot actively *argue* against the defendant's motion—creating a sometimes difficult to discern line between factual disclosure and adverse argument. *Pfannenstiel*, 302 Kan. at 765-66.

Based on its initial inquiry, a district court may conclude either that the defendant has no justifiable dissatisfaction and decline to appoint a new lawyer or that the attorney-

client relationship has been broken and grant the request for a new lawyer. In some situations, the district court properly may appoint the defendant a lawyer for a more in-depth hearing on the motion itself.

The district court exercises judicial discretion in deciding the motion. 302 Kan. at 760-61. An appellate court reviews the determination for abuse of discretion. A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Here, the district court inquired of both Ruhl and his lawyer to assess the circumstances underlying the motion. The hearing record shows Ruhl offered a number of specific grounds for his dissatisfaction.

• Ruhl alleged that his lawyer had not visited with him about the case. His lawyer countered that he had met with Ruhl, and he believed their ability to communicate had not been compromised. The prosecutor offered that the jail visitation logs showed the lawyer had visited Ruhl at least five times.

We pause to question whether the State's lawyer ought to be participating in the district court's initial inquiry. The State has no direct stake in the status of the relationship between a defendant and his or her appointed lawyer. A change in defense lawyers would alter the pretrial and trial schedule of a case, but that doesn't appear to be a sufficient reason to allow the State to intercede.

The structure of the initial inquiry is not strictly speaking an adversarial one, since the district court undertakes a relatively informal fact-finding function. For purposes of

8

that undertaking, the defendant is not represented by a lawyer. The defendant's lawyer is simply another source of factual information in response to the district court's inquiries and advocates neither for nor against the defendant's motion.

The prosecutor, however, remains the State's advocate. His or her involvement in the inquiry looks like the intervention of an adverse party (the State) acting through its lawyer. So an unrepresented criminal defendant must go forward in a proceeding in which the State is represented, creating an unlevel playing field—a situation that typically should be avoided in a criminal prosecution. Cf. *Iowa v. Tovar*, 541 U.S. 77, 80-81, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004) (defendant has constitutional right to counsel at critical stages of criminal prosecution); *State v. Jones*, 290 Kan. 373, 379, 228 P.3d 394 (2010) ("The right to counsel applies at all 'critical stages' of the criminal process of an accused who faces incarceration."). Had the district court appointed a lawyer for Ruhl for purposes of an evidentiary hearing on his motion, then the State presumably could have and would have participated in that hearing. Contrary to Ruhl's suggestion on appeal, however, we don't see the prosecutor's limited comments as prejudicing the outcome of the motion in the district court.

• Ruhl claimed that the lawyer failed to respond to his mother's telephone calls. But Ruhl didn't explain how that impaired the ongoing attorney-client relationship. The lawyer said he attempted to return every call he received from Ruhl's mother.

• Ruhl initially claimed that he had not received any discovery and could not work on preparing a defense. But he later conceded during the hearing that the lawyer had given him at least part of the preliminary hearing transcript, a copy of Sites' statement to police, and a copy of the probable cause affidavit summarizing many of the witnesses' observations. The lawyer told the district court he had provided Ruhl with the motions filed in the case and as much of the voluminous discovery as he could. The prosecutor

9

chimed in (impertinently in our view) that Ruhl was "very articulate" about the facts for someone who had received no discovery.

• Ruhl claimed that his lawyer did not tell him about the trial date. The lawyer said he had informed Ruhl of the trial date at least 50 days in advance and, in response to the district court's questions, elaborated on how he communicated that information.

• As he had in the motion, Ruhl claimed his lawyer failed to obtain his permission for trial continuances. But Ruhl identified only one continuance and admitted his lawyer needed that time to prepare the case. The lawyer said he could recall requesting only one continuance and represented that he would have informed Ruhl of every continuance.

• Ruhl claimed that his lawyer failed to investigate his alibi until just before the hearing. But Ruhl admitted the lawyer had an investigator interview his family members about the alibi. The lawyer did not specifically address Ruhl's allegation about the timing of his investigation. He informed the district court he investigated the alibi evidence. The lawyer filed a notice of alibi 10 days before the trial and identified Ruhl's aunt and mother as witnesses. See K.S.A. 22-3218 (defendant must provide State with written notice of alibi at least seven days before trial, identifying place where defendant claims to have been at time of crime and names of witnesses confirming alibi).

• When the district court asked Ruhl about the claim that his lawyer continued plea negotiations even as Ruhl insisted that he was innocent, Ruhl revised his complaint. He told the district court the lawyer had encouraged him to accept a plea offer he did not like.

After questioning Ruhl and his lawyer and listening to their statements about the representation, the district court found no legal support for the motion and declined to

10

appoint a replacement lawyer. As we have said, we review that decision for abuse of discretion.

The record fails to disclose any actual conflict between Ruhl and his trial lawyer. The lawyer did not have conflicting interests based on any past or current representation of another client—Ruhl had never suggested that sort of conflict. Likewise, neither the motion nor the discussion during the hearing showed that the lawyer had even potentially divided loyalties based on some personal or financial consideration. See *Sola-Morales v. State*, 300 Kan. 875, 883-84, 335 P.3d 1162 (2014) (outlining conflicts undermining lawyer's ability to adequately represent client). The hearing record showed no irreconcilable differences between Ruhl and his trial lawyer. Ruhl seemed to be annoyed with what he perceived as the lawyer's lack of attention and promptness in conferring with him and attending to some aspects of the case. But those annoyances did not amount to conflicts over fundamental strategic decisions or other matters reflecting major, let alone irreconcilable, differences that might impair the quality of Ruhl's legal representation. Similarly, nothing in the hearing record pointed to a breakdown in communication between Ruhl and the lawyer. And, so far as the record indicated, the lawyer had engaged in appropriate trial preparation and was ready to go forward.

The district court followed the procedure the Kansas Supreme Court has set out for addressing motions requesting new lawyers, and it otherwise understood the relevant law. Through its inquiry, the district court developed and assessed the facts. Given the law and the facts, the district court acted well within its judicial discretion to deny Ruhl's motion, which is to say from our perspective that other district courts would have come to the same conclusion.

On appeal, Ruhl tries to buttress his argument that he should have been appointed a new lawyer before trial with two episodes from the trial itself. The effort necessarily fails. First, of course, the district court could not have considered what happened during

11

the trial in deciding a motion that was presented and ruled on before trial. Second, the incidents do not establish a conflict of the sort suggesting or requiring replacement of the trial lawyer.

After the lawyer finished cross-examining Harden during the trial, Ruhl stood up in the courtroom and in the jurors' presence announced that he had "tried . . . to fire my attorney . . . [for] [i]neffective assistance of counsel." The district court repeatedly directed Ruhl to sit down and wound up excusing the jurors. The district court told Ruhl he was not helping himself in front of the jurors and should restrain himself or he would be removed from the courtroom. Ruhl briefly continued to verbally joust with the district court. The lawyer then asked the district court to advise Ruhl that outbursts in front of the jurors would "hurt his case" and that he "needs to settle down." The district court correctly noted that it had already said as much to Ruhl.

Outside the presence of the jurors the next day the lawyer made a brief record about the episode. He said he took "umbrage" at Ruhl's suggestion that he had not sufficiently prepared the case for trial and that, to the contrary, he had been "prepared for this case for a long time." The lawyer characterized Ruhl's statements to be "an emotional outburst."

We all recognize that tensions and tempers can run high in litigation, especially during jury trials involving serious criminal charges where the defendant's liberty hangs in the balance. Intemperate comments occasionally get voiced—sometimes by the lawyers, sometimes by witnesses, and sometimes by defendants. And intemperance in front of the jurors from any quarter is a problem, as the district court informed Ruhl. But Ruhl's flare-up and the anxiety it seemed to betray do not translate into a conflict of interest between lawyer and client.

The second episode Ruhl has raised on appeal carries even less significance. Before the defense began presenting evidence, the district court advised Ruhl outside the presence of the jurors that he personally had the right to choose to testify or not. See *State v. Brown*, 305 Kan. 413, 425, 382 P.3d 852 (2016) (defendant personally must make election whether or not to testify); *State v. Carter*, 270 Kan. 426, 439, 14 P.3d 1138 (2000). The lawyer completed the record by noting simply that he had advised Ruhl not to testify. Although Ruhl and the lawyer disagreed, a disagreement over one of the decisions entrusted to a criminal defendant's personal choice does not create a conflict or divided loyalties requiring a new lawyer. It is a commonplace of criminal defense practice and nothing more.

Ruhl neither established grounds requiring appointment of a new trial lawyer nor showed the district court erred in denying his request.

*Ineffectiveness of Trial Lawyer*

After Ruhl filed his appeal, he requested that this court send the case back to the district court to determine whether his trial lawyer had been constitutionally ineffective in representing him. We granted the request. The district court then held an evidentiary hearing—commonly known as a *Van Cleave* hearing—to determine if Ruhl had been adequately represented during his trial. See *State v. Van Cleave*, 239 Kan. 117, 119-20, 716 P.2d 580 (1986). Basically, a *Van Cleave* hearing accelerates the determination of a defendant's claim of constitutionally ineffective legal representation from a collateral proceeding under K.S.A. 60-1507 to the direct appeal.

Ruhl was appointed a new lawyer for the *Van Cleave* hearing, and his trial lawyer testified as to why he handled the case as he did. The district court entered a written order finding that Ruhl could show no grounds for relief based on his trial lawyer's performance. On appeal, Ruhl disputes that ruling.

13

The principles governing a *Van Cleave* hearing are the same as those applicable in a 60-1507 proceeding. We start there. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to competent legal representation. To demonstrate constitutionally ineffective assistance of the lawyer handling his criminal case in the district court, Ruhl had to show the representation fell below an objective standard of reasonableness resulting in legal prejudice, meaning there probably would have been a different outcome had the representation been adequate. See *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3-4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance); see also *State v. Butler*, 307 Kan. 831, 852-53, 416 P.3d 116 (2018) (reciting *Strickland* test and recognizing its adoption in *Chamberlain*).

In short, Ruhl must identify *both* substandard lawyering and resulting legal prejudice. As the United States Supreme Court and the Kansas Supreme Court have emphasized, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by an arguable or perceived lack of success. See *Strickland*, 466 U.S. at 689-90 (noting potential distorting effects of hindsight review, so courts generally should presume lawyer's representation falls within "wide range of reasonable professional assistance"); *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011).

In general, the courts look at a lawyer's overall performance in representing a criminal defendant in determining whether the Sixth Amendment right to counsel has been satisfied, meaning that a minor mistake or even a number of minor mistakes do not breach that duty. See *Harrington v. Richter*, 562 U.S. 86, 110-11, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question

14

under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal harm to the defendant to call into question an adverse outcome at trial or on appeal will suffice.

When reviewing the denial of a 60-1507 motion (or here a *Van Cleave* remand) upon a full evidentiary hearing, an appellate court accepts the district court's findings of fact to the extent they are supported with substantial competent evidence. The appellate court exercises unlimited review of the determinative legal issues. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007). Given the points Ruhl asserts on appeal, we don't perceive the resolution of factual disputes figuring in our review.

Ruhl contends his trial lawyer was constitutionally ineffective for not presenting both an alibi defense and an intoxication defense for the jurors to consider. The trial lawyer testified that he considered intoxication as a possible defense, since he anticipated the State would introduce evidence that Ruhl, Sites, and Harden were together drinking and taking illegal drugs shortly before the shooting. He made a professional judgment that the alibi defense offered a greater chance of success in front of the jury.

The two defenses are factually inconsistent, and presenting both of them to a jury would, by conventional wisdom, be considered poor strategy. With an alibi, the defendant argues he or she didn't commit the crime because he or she was someplace else and (ideally) has witnesses or other evidence to support that assertion. To advance a voluntary intoxication defense, a defendant essentially admits the charged criminal act but says he or she was so impaired by drugs or alcohol that he or she could not form the requisite mental intent to be found guilty. K.S.A. 2017 Supp. 21-5205(b); *State v. Gonzales*, 253 Kan. 22, 24, 853 P.2d 644 (1993) (voluntary intoxication provides defense to extent consumption of drugs or alcohol prevents defendant from forming any specific intent required to commit particular crime). Another panel of this court explained the

15

contradictory character of actively pursuing both a general denial of any involvement in the charged criminal activity and an intoxication defense in front of a jury:

> "To argue both defenses to the jury would be to argue, in effect, that if the jurors disbelieved [Defendant] about his lack of participation in the burglaries, they should consider whether he was too intoxicated to be guilty. In other words, the tacit message in presenting both is that [Defendant] might be lying to the jury about one of the defenses but should be believed about the other. That approach might be said to run counter to generally accepted notions of sound trial strategy. While a defendant in a criminal case may argue inconsistent or conflicting defenses, it is not a good idea." *State v. Poore*, No. 105,726, 2012 WL 1524321, at *1 (Kan. App. 2012) (unpublished opinion).

The *Poore* opinion tends to downplay the adverse consequences of advancing wholly inconsistent defenses by suggesting it is less than a "good idea." It more likely amounts to strategic self-immolation in all but the rarest of cases.

Here, for example, Ruhl testified he was at his aunt's home when Gurley was shot. An alternative defense of intoxication necessarily treats the alibi as false and, hence, Ruhl to be a liar in testifying to it. But an intoxication defense presumes Ruhl shot Gurley and would depend upon some showing that he was greatly impaired when he did so. Typically, that showing would include the defendant's own account of his or her loss of mental faculties due to the consumption of drugs or alcohol. See *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 (2011) (a defendant's ability to recall his or her actions demonstrates his or her faculties were sufficiently intact to negate a voluntary intoxication defense); *State v. Brown*, 258 Kan. 374, 386, 904 P.2d 985 (1995) (simply having consumed drugs or alcohol not enough to warrant jury instruction on voluntary intoxication). But the jurors, having recognized Ruhl to be a liar as to his alibi, would have no reason to believe his decidedly self-interested description of his degree of intoxication. To the contrary, they would have a compelling reason to disbelieve him based on his untruthfulness. See *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551

16

(2014) (jurors finding criminal defendant to have deliberately testified falsely about "one claim" may reasonably conclude defendant has falsified other claims). Moreover, Harden's testimony that the shooter exclaimed he had shot Gurley in the heart undercuts an intoxication defense, since the exclamation displays a conscious understanding and recognition of the criminal act.

The district court correctly concluded Ruhl's trial lawyer made a reasoned strategic decision to rely on an alibi defense to the exclusion of any possible voluntary intoxication defense. On this aspect of his claim, Ruhl cannot show his lawyer's performance fell below the constitutional standard of adequacy set in *Strickland*.

For his other point on appeal, Ruhl contends his trial lawyer should have requested a jury instruction on weighing testimony from accomplices. The committee on pattern jury instructions has developed an instruction that advises jurors to "consider with caution the testimony of an accomplice," referring to someone who admits having participated in the criminal conduct with the defendant. PIK Crim. 4th 51.090. Often, accomplices will have entered into agreements with the State to testify in exchange for a measure of leniency as to their own criminal liability, or they hope to secure such agreements by testifying. Those incentives arguably may induce such witnesses to falsely implicate the defendant on trial. The instruction simply notes potential credibility issues with accomplice testimony and dovetails with a defense argument that accomplices cutting deals may be unworthy of belief. See *State v. Salas*, No. 103,605, 2011 WL 2637432, at *3 (Kan. App. 2011) (unpublished opinion) (recognizing both pattern jury instruction on accomplice testimony and case authority permitting defendant to impeach accomplice witness based on government's extension of leniency).

Ruhl's trial lawyer did not request and the district court did not give the jurors an instruction on accomplice testimony. At the *Van Cleave* hearing, the lawyer explained that he forgot to ask for the instruction. Forgetfulness isn't strategy. And we can see no

tactical reason a defense lawyer would forgo an accomplice instruction in the run of cases in which the State presents such testimony. So Ruhl's trial lawyer erred. As we have explained, however, a single error doesn't necessarily render a lawyer's overall performance constitutionally deficient. We are inclined to say the error here didn't rise to that level.

But we will give Ruhl the benefit of every doubt and assume the failure to request the instruction amounted to constitutionally substandard representation satisfying the first part of the *Strickland* test. We remain unpersuaded that the omission of the accomplice testimony instruction so prejudiced Ruhl as to call into question the convictions.

Ruhl's trial lawyer cross-examined both Sites and Harden about their plea agreements with the State and their motives to testify adversely to Ruhl. In closing argument to the jurors, he explained why Sites and Harden should be treated as unreliable witnesses. The district court did instruct the jurors that they were "to determine the weight and credit to be given the testimony of each witness" and that they could use their "common knowledge and experience" in assessing the testimony. See PIK Crim. 4th 51.060. The general instruction implicitly invited the jurors to consider what Sites and Harden had to gain through their plea agreements in measuring their credibility. All of that essentially covered the territory of potential unreliability of accomplice testimony. So PIK Crim. 4th 51.090 would have added little.

In addition, the State admitted as trial evidence recordings of telephone calls Ruhl made from jail to friends and relatives after his arrest. Although the calls did not include an outright confession, Ruhl made statements that are implicitly inculpatory and inconsistent with his alibi defense. The evidence tended to corroborate the State's theory of the shooting and the testimony of Sites and Harden.

18

Ultimately, the jurors had to weigh the credibility of Ruhl and his alibi witnesses—his aunt and his mother—against the credibility of Sites, Harden, and the State's other evidence. The manner in which the witnesses testified at trial would have figured prominently in the jurors' task. As this court has recognized: "'[t]he judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement.'" *Franco*, 49 Kan. App. 2d at 936 (quoting *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 [2012] [Atcheson, J., dissenting]).

In similar circumstances, the Kansas Supreme Court has found the failure to provide the jury with an instruction on accomplice testimony to be harmless error. See *State v. Buehler-May*, 279 Kan. 371, 385, 110 P.3d 425 (2005); *State v. Crume*, 271 Kan. 87, 94-95, 22 P.3d 1057 (2001). We reach a like conclusion here, as did the district court at the end of the *Van Cleave* hearing.

Ruhl has failed to show that his trial lawyer's performance met the *Strickland* test requiring reversal.

*Conclusion*

We have carefully considered the points and arguments Ruhl has raised on appeal. We find no basis in those points and arguments to reverse Ruhl's convictions or the judgment entered on them.

Affirmed.

19