IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,851


STATE OF KANSAS,
*Appellee*,

v.

JAMES D. BOATWRIGHT,
*Appellant*.


SYLLABUS BY THE COURT


1.

An accomplice instruction is not an absolute necessity when the jury receives a general credibility instruction and any juror of average intelligence would have heard the accomplice's testimony and an accompanying thorough and detailed cross-examination and realized that credibility was at issue.


2.

In assessing whether prosecutorial error occurred, appellate courts do not consider a statement in isolation but look to the context in which the disputed statements were made.


Appeal from Shawnee District Court; JASON E. GEIER, judge. Oral argument held March 31, 2025. Opinion filed May 23, 2025. Affirmed.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach,* attorney general, were with her on the brief for appellee.


1

The opinion of the court was delivered by

ROSEN, J.: James D. Boatwright appeals from his conviction for first-degree murder, criminal discharge of a firearm, and conspiracy to commit first-degree murder. We find no error in the conduct of the trial and accordingly affirm.

The State sought to prove to the jury that Boatwright and another individual fired shots from a car, resulting in the death of the driver of another car. A friend was driving the car from which Boatwright was shooting, and the friend's testimony played a key part of the State's case. Boatwright disputed the friend's testimony and told the jury he was nowhere near the scene of the shooting at the time the murder took place.

In developing its case, the State presented evidence showing close relationships among a variety of people living in Topeka, including Boatwright, Davontra Alston, and Diquan Clayton. Danielle Morrison had a child with D'Angelo Payne—the victim in this case—and she also occasionally dated Clayton. As a consequence, Payne and Clayton had developed animosity toward each other, exacerbated by an incident in which Payne kicked in the door of Ashley Bugg's house where, among other people, Morrison, Clayton, and Alston were living. After the incident with the door, Alston developed his own animosity toward Payne.

On the evening of April 4, 2020, Payne visited Bugg's house and talked with Morrison in a car parked outside the house. Around 10:30 p.m., Clayton left the house to pick up a friend from work and get some food. Clayton then drove to Jeffrey Walters' house to get some clothes. At 11:21 p.m., Clayton sent a text to Morrison's phone reading: "He said you better get out the car that MF finna get shredded."

2

Clayton and his friend returned to Bugg's house. Morrison got out of the car and Payne drove off. Morrison overheard Alston on a phone call say, "He's leaving now in a Ford Taurus," the kind of car Payne was driving.

While this was taking place, Boatwright, KeShawn Ivy, and Damir Williams were at a party at Walters' house. Boatwright had driven Ivy and Williams to the party in his Honda Civic. Ivy was a close friend of Boatwright, and he was acquainted with Alston and Clayton as friends of Boatwright. Boatwright received a phone call from Clayton, and Boatwright then asked Ivy to drive him "to make a play." Ivy agreed and drove Boatwright's Civic, with Boatwright in the front passenger seat and Williams in the back seat.

Boatwright told Ivy to take him to Bugg's house. When they reached the house, they did not see any cars parked in the lot and Boatwright told Ivy to "never mind" and leave. They started to return to Walters' house. When they reached the intersection of Fifth and Western, Ivy heard gunshots coming from his right side. He did not actually see anyone firing shots.

Police responded and found Payne's car wrecked in a front yard. Payne died from a gunshot wound in the back of his head. Police found eleven 9 mm shell casings and eight .357 shell casings in the area.

After the shooting, Ivy drove them back to Walters' house, and he and Boatwright went inside. They did not talk about the shooting, and Boatwright later drove Ivy to a hotel so he could spend the night with his girlfriend.

At Bugg's house, Morrison observed Alston laughing and showing his phone to Clayton and Bugg. Morrison took the phone and saw a text message reading, "Job done," but she did not see a name or number associated with the text. Morrison then went to her

3

bedroom and started checking Facebook to see if anything was going on in the area. She found a newsfeed reporting there had been a shooting a couple of blocks away. A Facebook profile associated with Alston posted laughter reactions to the newsfeed.

Clayton and Morrison exchanged text messages after the shooting. Morrison specifically asked Clayton, "Did they kill him?" Clayton answered:  "Nigga if I want him dead I'll do it myself I told you that. Tf. Nigga an they was on they way here anyways an seen y'all before I did. Thats how I knew y'all was outside."

On the morning of April 5, Boatwright and Ivy went to the home of Clayton's mother. While Boatwright and Ivy were still at their car, she overheard Ivy say, "Man, that's crazy. We got that nigger."

On the evening of April 5, Alston called Alyson Howard, a friend of Morrison, and asked her if he could stay at her residence in Kansas City. Alston told her, "When guns get to toting bodies get to dropping. Gotta go, gotta go, gotta go." Howard asked him, "Fifth and Western?" Alston answered, "Yes." Howard then asked Alston "if he did it." Alston said, "No. I have people who do that for me."

The next day, police arrested Ivy and searched his car. They found two semiautomatic firearms, but it was determined that neither weapon was used in the shooting that killed Payne. Ivy initially denied having any connection to the shooting but later told police that Boatwright and Williams were in the car during the shooting. He said that he was unaware of any conflict between Alston and Payne and that he had no reason to kill Payne.

He also told them that he, Walters, and Boatwright had once gone to a bridge and practiced shooting. He had a Snapchat video of them shooting the guns and he identified Boatwright firing a gun that had been modified to make it fully automatic.

4

Ivy was eventually released from custody and no charges were pursued related to this event.

Boatwright was also arrested. When police searched Parker Miller's house, where Boatwright was staying at the time, they found a firearm hidden in a space over the kitchen ceiling. The gun had been modified to make it fully automatic. This firearm matched shell casings collected both from around the bridge where the practice firing took place and at the scene of the shooting at Fifth and Western.

In addition to the firearm, police seized Boatwright's phone from Miller's house. The phone had been factory reset, which erased all its data. Police also seized Alston's phone, which had likewise been factory reset. When Clayton's phone was seized, police were able to download the contents. Phone records showed there were text messages sent between Alston and Boatwright as well as calls between Clayton and Boatwright both shortly before and after the shooting, but the factory resets made it impossible for police to ascertain what the text messages said.

At trial, Boatwright testified on his own behalf. He contradicted significant portions of the story that Ivy presented to the jury. He testified that he went practice shooting on March 31 and tried out a handgun belonging to Ivy that had been modified to operate with automatic action.

He told the jury Ivy showed up alone at the party at Walters' house. Nothing unusual happened at the party, and Boatwright's girlfriend Julie picked him up after 9 p.m. They went to a Best Western Motel. According to Boatwright, he did not know who D'Angelo Payne was, he had no intent to harm him, and he did not shoot at Payne's car. He told the jury he did not know there had been a shooting until he saw the Topeka Police Scanner on Facebook the next day. Boatwright testified that he owned a handgun, a .380

Taurus Curve, but the gun was in the trunk of his Civic the night of the shooting and he was not in the car at the time of the shooting. He said he did not know a disabled Glock had been hidden in the ceiling of the kitchen at Miller's house. He acknowledged that he had reset his phone, which he said he did because he was selling it to Miller.

The State rebutted Boatwright's testimony by calling Miller, who testified Boatwright did not sell him a phone and that he not only did not know a gun was hidden above his kitchen ceiling, he was unaware there even was attic space above the kitchen until the police searched there. The State also provided evidence in the form of a phone call Boatwright made from jail to Williams and an unknown woman during the trial. Boatwright told them Ivy had testified and "he told everything." Williams responded, "Damn."

The jury found Boatwright guilty of first-degree murder, criminal discharge of a firearm, and conspiracy to commit first-degree murder. The court sentenced Boatwright to a hard 50 life sentence for premeditated murder. The court also sentenced him to 131 months for conspiracy to commit first-degree murder and a concurrent term of 59 months for criminal discharge of a firearm. He took a timely appeal to this court under K.S.A. 60-2101(b) and K.S.A. 22-3601(b)(3).

*The Jury Instructions*

Boatwright contends the district court erred when it failed to give an instruction cautioning the jury in how to evaluate Ivy's testimony when he was an accomplice to the crimes.

Boatwright did not request an accomplice testimony instruction, and he did not object to the instructions for failing to include such an instruction. When a party does not object to the failure to give a jury instruction, this court reviews the instruction to

6

determine if it was clearly erroneous. K.S.A. 22-3414(3). The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021). When no instruction on accomplice testimony is requested, the failure to give such an instruction requires reversal only if clear error occurred. *State v. Goens*, 317 Kan. 616, 617, 535 P.3d 1116 (2023).

The district court did not give an unrequested instruction about accomplice testimony. That instruction reads: "An accomplice witness is one who testifies that (he) (she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice." PIK Crim. 4th 51.090 (2020 Supp.).

The district court instead gave the jury a general credibility instruction: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

When a party asserts an instruction should have been given, the party must show the instruction would have been legally and factually appropriate. See, e.g., *State v. Holley*, 313 Kan. 249, 254-55, 485 P.3d 614 (2021). If the instructions as given properly and fairly stated the law and were not reasonably likely to mislead the jury, then this court will not find error. It is immaterial whether, in retrospect, another instruction would also have been legally and factually appropriate, even if that instruction might have been clearer or more thorough than the one given. See *State v. Z.M.*, 319 Kan. 297, 326-27, 555 P.3d 190 (2024).

Ivy drove the car from which Boatwright was accused of firing the fatal shots. An accomplice is someone who testifies that he or she was involved in the commission of the crime with which the defendant is charged. See *State v. Davis*, 283 Kan. 569, 577, 158

P.3d 317 (2006). Although the State contends that Ivy was not an accomplice because no evidence showed he was anything more than someone present at the scene of the crime, we do not need to parse the evidence to decide whether an accomplice instruction would have been legally and factually appropriate in this case. We will assume without deciding that the instruction would have been appropriate, but we conclude the district court did not err when it did not give the unrequested instruction.

Boatwright urges this court to hold that a cautionary instruction was necessary because Ivy's testimony was so important and because it tended to deflect blame from Ivy. But, as the court noted in *Goens*, the proper question is whether any juror of average intelligence could have heard Ivy's testimony and the accompanying cross-examination without realizing that credibility was at issue and whether Ivy was properly subjected to thorough and detailed cross-examination. *Goens*, 317 Kan. at 618-19; see also *State v. Simmons*, 282 Kan. 728, 741, 148 P.3d 525 (2006). In other words, under these circumstances, we consider whether the instructions that were given fairly stated the law and were not likely to confuse the jury.

Boatwright's attorney subjected Ivy to extensive cross-examination. He pointed to inconsistencies between Ivy's trial testimony and his initial statements to police, and he got Ivy to admit he had made untruthful statements to the police. Then, under redirect examination, Ivy again conceded that he was not completely honest with the police at his initial interview. In addition, Boatwright testified that Ivy was not telling the truth when he told the jury Boatwright was in the car with him. This would have made it clear to the jury that the credibility of two conflicting witnesses was in play and it would have to decide which one was the more believable.

The jury could have simply evaluated who seemed more credible based on demeanor, the consistency of statements, and responses to cross-examination. But the jury considered additional evidence supporting Ivy's version and disputing Boatwright's

8

version. The firearm used in the shooting was found in the apartment where Boatwright stayed after the murder, and no one else had been seen visiting the place. Text messages and phone calls immediately before and after the shooting indicated that Boatwright knew what had taken place and when and where it happened.

These factors lead us to conclude that no juror of average intelligence could have heard Ivy's testimony and the accompanying cross-examination without realizing that credibility was at issue. Ivy's version of events was not the only evidence incriminating Boatwright. And Boatwright, through his own testimony, made Ivy's credibility a central feature of the trial.

The failure to give an accomplice instruction is not error if the judge provided another instruction cautioning the jury about the weight to be accorded testimonial evidence. See *State v. Crume*, 271 Kan. 87, 94-95, 22 P.3d 1057 (2001). An accomplice instruction is never an absolute necessity. It is at most merely part of the general conduct of a trial, over which the judge exercises discretionary power, akin to the control over cross-examination or comments on evidence. See *State v. DePriest*, 258 Kan. 596, 606, 907 P.2d 868 (1995).

The instructions as they were given fairly stated the law and were unlikely to confuse the jury. We find no error in the district court submitting instructions to the jury that did not include a specific accomplice cautionary instruction.

*The Prosecutor's Closing Arguments*

Boatwright maintains the prosecutor committed five distinct errors in the course of making closing arguments and these errors, individually and collectively, prejudiced his defense and require reversal of his conviction.

This court employs a two-step process when evaluating claims of prosecutorial error: whether there was error, and whether that error was prejudicial. See *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

When determining whether prosecutorial error occurred, this court decides whether the prosecutorial acts at issue fall outside the wide latitude prosecutors have to conduct the State's case and seek a conviction in a manner that does not impair the defendant's constitutional right to a fair trial. If it finds error, this court next determines whether the error prejudiced the defendant's due process rights to a fair trial. To decide whether there was prejudice, this court adopts the constitutional harmlessness inquiry set out in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under this standard, prosecutorial error is deemed harmless if the State can demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, that is, there is no reasonable possibility the error contributed to the verdict. See *State v. Mendez*, 319 Kan. 718, 737, 559 P.3d 792 (2024).

In assessing whether error occurred, we do not consider a statement in isolation but look to the context in which the disputed statements were made. See *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022). Boatwright asserts five instances of errors the prosecutor committed in making closing arguments. The general gravamen of the argument is that the prosecutor used closing arguments as a forum to express his personal opinions and accusations to the jury. Some of the asserted errors, when viewed in isolation or outside the context of the State's case, may appear improper, but we conclude that all of the challenged statements were acceptable in the light of the entire argument and the evidence the State introduced.

A. Asserted Commentary About Boatwright Exercising His Privilege Against Self-Incrimination

Boatwright sets out well established law prohibiting prosecutors from commenting on defendants invoking their right not to speak to law enforcement. See *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Fisher*, 304 Kan. 242, 250, 373 P.3d 781 (2016) (error for prosecutor to state that defendant "'[n]ever said a word about these things until today'"); *State v. Gadelkarim*, 256 Kan. 671, 887 P.2d 88 (1994); *State v. Heath*, 222 Kan. 50, 563 P.2d 418 (1977) (prosecution committed reversible error by commenting in closing argument about defendant's post-arrest silence).

In *Doyle*, the defendants did not give their version of the story to arresting officers but waited to present an exculpatory story until trial. The Supreme Court found it reversible error for the prosecution to bring up before the jury why they did not tell their exculpatory story at the time of their arrest. The Court held that a defendant's post-arrest silence does not allow an inference that a subsequent exculpatory story has been fabricated and does not permit prosecutors to impeach such a story by pointing out silence at the time of arrest. *Doyle*, 426 U.S. at 617-18.

But did the prosecutor in the present case call to the jury's attention Boatwright's decision not to make statements to the police? We hold he did not. Boatwright picks one sentence out of the closing argument and asserts it violated *Doyle*:

> "Unlike Keshawn Ivy, who was grabbed off the street and brought down to the police station, and then interviewed for several hours, the defendant has had the opportunity, for months, to prepare his testimony, to look at all of the State's evidence, the videos, the police reports, and the records."

11

This statement was, at most, an oblique reference to Boatwright not speaking to police. As the State points out, in the course of his own direct testimony, Boatwright told the jury that he invoked his right to remain silent and to consult with an attorney when the police attempted to question him. The prosecutor did not ask him to address that decision during cross-examination.

The prosecutor's statement about Boatwright having months to prepare his testimony was a suggestion that he had ample opportunity to craft a story that was more-or-less coherent, not that he must have been covering something up when he exercised his Fifth Amendment right to silence. Furthermore, the prosecutor was explaining why Ivy may have changed his story: he was on the spot when he was arrested and panicked. The prosecutor was simply explaining to the jury why the State's most essential witness initially gave inconsistent accounts to police, while Boatwright was able to present a more internally consistent story to the jury. We find no *Doyle* violation here.

B. Calling Boatwright a Liar

Boatwright points to ample caselaw prohibiting prosecutors from accusing defendants of lying. See *State v. Liles*, 313 Kan. 772, 776, 490 P.3d 1206 (2021); *Haddock v. State*, 282 Kan. 475, 146 P.3d 187 (2006); *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005); *State v. Henry¸* 273 Kan. 608, 44 P.3d 466 (2002); *State v. Brown*, 300 Kan. 542, 331 P.3d 781 (2014).

But, when a defendant presents a version of events that runs counter to the State's theory of what happened, prosecutors almost necessarily imply that the defendant is lying. What is clearly prohibited is a prosecutor expressing the personal opinion that the defendant is not telling the truth. See, e.g., *State v. Akins*, 298 Kan. 592, 608, 315 P.3d 868 (2014) (prosecutors have wide latitude to point out inconsistencies in defendant's

statements and to argue evidence reflecting poorly on defendant's credibility, but prosecutors may not offer personal opinions that defendant's testimony was untruthful).

In this case, Boatwright points to two statements by the prosecutor that he contends showed the prosecutor accused Boatwright of lying:

> "[T]he defendant has had the opportunity, for months, to prepare his testimony, to look at all of the State's evidence, the videos, the police reports, and the records. And if it were his desire, he could craft or come up with testimony. And it appears that he has, testimony that sort of bobs and weaves around all the various pieces of evidence that the State has.
>
> "There are other things that the defendant has said that is flatly contradicted by other evidence."

Later, the prosecutor contrasted the credibility of Ivy's testimony with that of Boatwright's testimony. The defense attorney had argued that Ivy was motivated to lie about Boatwright's whereabouts during the shooting, and the prosecutor responded:

> "[W]hen you consider the defendant's theory, let's look at the testimony and the statements of Mr. Keshawn Ivy, because the argument that has been made to you is, 'How many times does a person have to be dishonest with you before you would stop believing them?'
>
> "Well, that's the question you could apply to Mr. Boatwright's testimony, couldn't you? Do you believe that he tried to deceive you when he testified? Do you think that he has a reason to deceive you when he testifies? Do you think he has the opportunity to deceive you, to look at all this evidence and craft a story that seems to weave in and out of all these pieces of evidence which tend to make him look guilty?
>
> "Well, just like with any other witness, you should question the motivations. And I've talked to you about Mr. Boatwright's motivation. Obviously, he would like you to

13

believe that there is a reasonable doubt, and that he wasn't present at the time of this murder."

The prosecutor then proceeded to explain to the jury why the evidence was more consistent with Ivy's version of events and suggested that Ivy had the better motivation to tell the truth.

Taken in its entirety, the prosecutor's statements appear to be more about why Ivy was the more credible witness. This is consistent with the position this court took in *Liles*, 313 Kan. at 777, where the court held the prosecutor "did not suggest Liles' testimony was unbelievable just because she was the defendant exercising her right to testify. And after pointing out Liles' interest in the outcome, the prosecutor made an evidence-based argument" as to why the jury should believe the State's witnesses over the defendant's witnesses.

Boatwright's attorney challenged Ivy's truthfulness on cross-examination and then argued during closing statements that Ivy had lied to the police when he was initially taken into custody and that he had strong motivation to lie to the jury about his involvement in the crime, attempting to deflect responsibility to Boatwright. The prosecutor exercised his prerogative to compare the evidence supporting each witness' version and to compare each witness' motivation for telling the truth.

Although the prosecutor told the jury that Boatwright's testimony "sort of bobs and weaves around all the various pieces of evidence that the State has," this statement was tied to specific evidence and challenged Boatwright's contrived explanations for events, such as his erasing his cell phone immediately after the shooting and then claiming he did that because he was selling it to someone who testified he was not buying the phone.

14

We conclude the prosecutor did not go beyond stating the evidence and explaining why the State's version was the more sensible explanation of what happened.

C.  Vouching For Ivy's Credibility

Boatwright again asserts the prosecutor improperly provided the jury with his personal opinion of the credibility of a witness, in this instance, the State's most important witness, KeShawn Ivy. Boatwright provides extensive authority for the proposition that prosecutors may not vouch for the credibility of their own witnesses. See *Elnicki*, 279 Kan. 47; *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000); *State v. McHenry*, 276 Kan. 513, 78 P.3d 403 (2003). The question before this court now is whether the prosecutor in this case improperly asserted to the jury a personal opinion that Ivy was telling the truth.

Boatwright's attorney had aggressively challenged Ivy's credibility during closing argument. For example, he stated to the jury:  "[R]emember the testimony of Mr. Ivy, who's accused, and lied, and accused others of holding the gun, or being in possession of the gun, numerous times. He raised different stories to the police as to how this all took place." He also told the jury:

> "So Keshawn Ivy—and he's a hard person to read from everything he says. And if you remember, he had four different versions of what took place. He said he didn't know Mr. Boatwright, and we know that they went on a vacation together. That he heard of Mr. Alston, Davontra Alston, yet you can see, if you look in the Facebook records, there's communications between Keshawn Ivy and Davontra Alston, so him not knowing Mr. Alston is also an untruth."

Boatwright maintains on appeal that the prosecutor's response to this challenge to Ivy's credibility amounted to giving a personal opinion about Ivy's testimony. He cites to several statements by the prosecutor allegedly improperly bolstering Ivy's testimony.

15

These statements should be considered in the context of Boatwright's challenges to Ivy's credibility.

> "[L]et's look at the testimony and the statements of Mr. KeShawn Ivy, because the argument that has been made to you is, 'How many times does a person have to be dishonest with you before you would stop believing them?'
>
> . . . .
>
> "[Y]ou have reason to believe that a person who gives you a story that they want you to believe, or that they want you to hear, that gets them out of trouble, is more likely to not be telling you the truth, whereas when a person tells you stuff that damages them, which is not usual, then it is more likely to be true.
>
> "And in Keshawn Ivy's case, by the end of that interview, he ended up going to jail. And he admitted to the commission of the crime of the possession of the two—or the nine millimeter in the Honda Civic, which was not involved in this case. And he was also given no promises that he would not be prosecuted for the murder. And yet he continued to describe what happened, as I previously talked about. First it was, 'I heard that it was Mr. Boatwright.' And then he indicates that, 'Well, Mr. Boatwright was there because I was actually driving him.'
>
> "And so the thing about Keshawn Ivy's testimony is, like I say, it fits with all of the other evidence, the telephone records, the 97th and Lewelling video, the shell casings from both locations, the discovery of the gun in close proximity to the defendant, the fact that Mr. Boatwright erased his phone, and Mr. Alston erased his phone. All of that evidence together gives you a very clear picture of what happened, and it all tends to corroborate Keshawn Ivy's account.
>
> "And the defense had presented no evidence, whatsoever, to credibly lead you to the conclusion that Keshawn Ivy has come in here to deceive you in order to protect Jeffrey Walters."

16

We find nothing in these statements suggesting the prosecutor "vouched" for Ivy's credibility. Instead, the prosecutor gave reasons why, based on common experience and the testimony before the jury, it was more likely that Ivy was the one telling the truth. The defense challenged the credibility of a witness for the State; the State had the responsibility to explain why its witness was the more believable. At no point did the prosecutor tell the jury that it was his personal opinion that Ivy was a truthful person and Boatwright was a dishonest person. There was no prosecutorial error.

D.  Shifting the Burden of Proof

Boatwright argues the prosecutor implicitly shifted the burden to Boatwright to prove he was not guilty. According to Boatwright, the prosecutor did this by acknowledging gaps in the State's evidentiary case and telling the jury that evidence was missing because of conduct on Boatwright's part. The weight of Boatwright's argument concerns the State's inability to produce text messages and the State's speculation that those missing messages would have been incriminating.

A prosecutor may not attempt to shift the burden of proof to the defendant. See, e.g., *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014); see also *State v. Wilson,* 295 Kan. 605, 623-25, 289 P.3d 1082 (2012) (prosecutor's arguments that defendant had no explanation for his DNA found near crime scene did not improperly shift burden of proof; it instead pointed jurors to lack of evidence supporting defendant's version of events).

Here, we must decide whether the prosecutor was asking the jury to make Boatwright prove what was contained in the missing messages or whether the prosecutor was explaining to the jury why it could not produce those messages and what evidence supported a theory that the messages were incriminating.

17

Boatwright acknowledged that he "factory reset," or erased, his phone a day or two after the shooting, allegedly because he was selling it to Miller. Phone records showed phone calls between Boatwright and various individuals within a few minutes before and after the shooting. Witness testimony, including that of Boatwright, showed that he had sent and received text messages on the day of the shooting, including exchanges with Alston, who was also convicted of murdering Payne. According to a witness, one of the texts that Alston received shortly after the shooting read, "Job done." Boatwright denied having sent a text with that message.

Boatwright asserts that the prosecutor shifted the burden to him by asking the jury to speculate about the contents of phone calls and text messages. In these statements, the prosecutor explained why evidence was missing and why that evidence was more likely than not to be incriminating.

The prosecutor proceeded to then set out the evidence supporting the State's case, including Boatwright firing a weapon used to kill Payne, the phone records showing calls among people who had a grudge against Payne, calls to and from Boatwright close in time to the murder, Ivy's testimony that Boatwright was riding in the car and shots were fired from where Boatwright was sitting, and text messages sent among various individuals connected to the shooting.

The prosecutor also took issue with the defense claim that the State's case largely consisted of guesswork. Although the State was not able to produce the exact messages that Boatwright and Alston sent and received, the prosecutor pointed to other evidence supporting its case and then pointed out that Boatwright and Alston had factory reset their phones, erasing the exact wording of the texts. He argued that the evidence, including the timing of the texts and the testimony of other witnesses, tended to prove the messages were incriminating.

18

All in all, the prosecutor did not tell the jury that Boatwright had to prove he did not send text messages. Instead, the prosecutor told the jury that witness testimony stated the content of a text message that testimony showed Boatwright sent after the shooting. The State produced positive evidence; it did not require Boatwright to prove the unprovable, that he did not send incriminating messages. The prosecutor did not shift the burden of proof to Boatwright.

E. Improper Appeal to Community Interests

Boatwright argues the prosecution erred by appealing to the jury's prejudices and deflecting the jury's consideration from the evidence. Prosecutors may not encourage jurors to base their verdicts on emotions, passions, or prejudices because those considerations are not facts. See, e.g., *State v. Holt*, 300 Kan. 985, 997-98, 336 P.3d 312 (2014); *State v. Hall*, 292 Kan. 841, 853, 257 P.3d 272 (2011).

Boatwright specifically takes issue with a comment the prosecutor made about the motivation for the shooting:

"I will agree with him [Boatwright], the idea that someone goes over to your house and breaks down the door, or that you happened to be dating the same woman, to me, and perhaps to you, does not seem like a very good reason to kill someone.

"But it is a reason. And that doesn't necessarily mean that it was not a reason to these people, these Gangster Disciples, who, perhaps, felt disrespected by Mr. Payne being at the house on April 4th, 2020.

"It's called senseless violence for a reason. And that is because we cannot, now in this courtroom, make sense of it. We cannot say that this was a good reason.

19

"But as I said, the evidence shows that these two men have a reason to not like Mr. Payne and to want him to be killed. And the evidence shows that's exactly what they did."

Boatwright contends the phrase "senseless violence" was an appeal to community interests and the fear that acquitting him would place the community in peril.

The context of a prosecutor's comments is important when considering whether the comments improperly appealed to community interests. See, e.g., *State v. Buck-Schrag*, 312 Kan. 540, 545-46, 477 P.3d 1013 (2020). In *Buck-Schrag*, the prosecutor stated to the jury that people are not permitted to kill each other with guns just because they are afraid. This court held the comments were proper in context: they were made to impress upon the jury the legal reality that one cannot use deadly force based solely on subjective fear. *Schrag*, 312 Kan. at 547. In *State v. Gallegos*, 313 Kan. 262, 485 P.3d 622 (2021), the prosecutor suggested to the jury that no one deserves to die the way the victim did and the victim's life was worth more than $100 and more than the defendant's pride. This court examined the context of the statement and found no error because the prosecutor was properly telling the jury it should not consider the victim's status in deciding whether the defendant committed murder. *Gallegos*, 313 Kan. at 276.

Here, the context of the prosecutor's statement indicates he was *not* telling the jury that the murder was an act of "senseless violence"; instead, he was arguing that there was indeed a motive for the shooting, even if the motive might not make sense to the jurors. The comment did not ask the jury to punish or take a stand against random violence. It asked the jurors to agree with the State's theory that this was a revenge killing, a theory that was supported by competent evidence. This was a proper commentary on the evidence.

CONCLUSION

Although Boatwright argues for application of the cumulative error doctrine, we find no errors among the issues he raises on appeal. We affirm the conviction.

Affirmed.

WILSON, J., not participating.